**Jim DYKES, Plaintiff, Appellant,**

v.

**DEPUY, INC., Defendant, Appellee.**

No. 97–1592.

United States Court of Appeals, First Circuit.

Heard Sept. 4, 1997.

Decided April 3, 1998.

David C. Casey, Boston, MA, with whom Michael G. Donovan and Peckham, Lobel, Casey, Prince & Tye, were on brief, for appellant.

Donald E. Knebel, Indianapolis, IN, with whom Dwight D. Lueck and Barnes & Thornburg, were on brief, for appellee.

Before STAHL, Circuit Judge,
CAMPBELL and BOWNES, Senior Circuit Judges.

CAMPBELL, Senior Circuit Judge.

This appeal arises from the district court's grant of summary judgment in favor of defendant-appellee DePuy, Inc. ("DePuy") on six counts of an eleven-count amended complaint brought against DePuy by plaintiff-appellant Jim Dykes. In 1994, DePuy terminated Dykes and his firm from continuing to act as its New England sales representative. Dykes had, by then, represented DePuy in one or another capacity for over sixteen years. When terminated, Dykes was still four years away from possible qualification under DePuy's "Compensation Upon Termination" program, which would have allowed him to claim a substantial annual income for ten years. He sued DePuy alleging federal claims under ERISA and the ADA, and state claims, including bad faith termination. In awarding summary judgment to DePuy, the district court concluded, *inter alia*, that Dykes was an independent contractor, hence barred from suing under ERISA and the ADA. The court further rejected his state-law claims for bad faith termination. The court also refused to allow Dykes to engage in further discovery. We affirm.

## I. BACKGROUND

Because this case comes to us after a grant of summary judgment, we state the facts in the light most favorable to the nonmoving party, indulging all inferences in that party's favor. *See Ortiz–Pinero v. Rivera–Arroyo*, 84 F.3d 7, 11 (1st Cir.1996).

DePuy is an Indiana-based company that manufactures orthopedic products. During the time period relevant to this action, DePuy marketed its products via a network of "sales representatives," each of which was responsible for sales within an assigned territory. Sales representatives, in turn, hired "sales associates" to help them conduct business.

In 1977, Dykes was hired as a sales associate by DePuy–Morse, a sales representative of DePuy located in South Easton, Massachusetts. Dykes held that position until 1981, when he was hired as a sales associate by Ron Wood of Wood–Yates, a sales representative of DePuy located in Cheshire, Connecticut. Dykes performed extremely well as a sales associate; he was named Sales Associate of the Year in 1986.

In 1988, when Dykes learned that Ron Wood planned on retiring, Dykes formed Health Systems, Inc. ("Health Systems"). On July 1, 1988, Health Systems, Dykes, and DePuy entered into a Sales Representative Agreement ("SRA"). According to the SRA, Health Systems was the "Representative," defined as the "exclusive Sales Representative for all products sold by DePuy," and Dykes was the "Principal," meaning that he was the "owner of all or substantially all of the outstanding shares of Representative."

The SRA not only set out the terms under which the parties would conduct business but also undertook to define the legal relationship between the parties. Thus, it expressly declared that the Representative was an independent contractor and that the persons hired by the Representative were not employees or independent contractors of DePuy itself. The SRA gave the Representative discretion regarding the time and manner of making sales calls and the responsibility for paying taxes, unemployment compensation, workers' compensation, and insurance premiums. The SRA lasted for one year and renewed automatically "unless terminated by either party giving at least 90 days' notice prior to the end of the initial period or any renewal period." The SRA did not require "good cause" termination or place any other limitation on the parties' ability to sever their relationship.

Pursuant to the SRA, DePuy offered a "Compensation Upon Termination" program to its sales representatives. Under this program, Dykes would receive substantial compensation on an annual basis for a period of ten years after the termination of the SRA if, and only if, he satisfied certain conditions precedent. In order to qualify, Dykes had to work at least fifteen years as a sales representative, or a combination of twenty years as a sales representative and sales associate, with at least ten years as a sales representative. In addition, Dykes had to sell a certain volume of DePuy's products in the year before the termination of the SRA. The SRA expressly provided that the Compensation Upon Termination program,

> shall not restrict the right of DePuy to terminate Representative or restrict the right of Representative to terminate its relationship with DePuy. If that relationship is terminated before Representative and Principal have met the conditions precedent ..., Representative and Principal will have no rights under this Agreement.

According to Dykes, DePuy frequently promoted the Compensation Upon Termination program to maintain the sales representatives' loyalty and to ensure their longevity with the company.

As a DePuy sales representative, Health Systems was responsible for selling DePuy's products in "DePuy New England," a territory defined by DePuy that included Maine, Vermont, most of New Hampshire, Connecticut, and portions of Massachusetts. As the Principal of Health Systems, Dykes had a great deal of autonomy. For example, he himself decided how much compensation he would receive. DePuy never asked Dykes how many hours he worked and Dykes could take a vacation without notifying DePuy. Dykes could not recall sending DePuy any information on Health Systems's expenses or profits. DePuy provided an educational allowance to enable representatives to conduct seminars in their territory and a "bonus commission program" designed to help representatives buy medical instruments and hire sales associates, but Dykes could choose whether to avail himself of these benefits.

Dykes also controlled the day-to-day operation of Health Systems. He hired and established salaries for his office staff without consulting DePuy. He hired and paid his wife to assist him with Health Systems's business. Dykes fired at least one sales associate without DePuy's prior knowledge. Commissions on the sales made by Dykes's sales associates were paid by DePuy at first to Dykes, and then to Health Systems. De-

Puy reported this income on Form 1099s, not W–2s, and did not withhold taxes. In turn, Dykes paid each of his sales associates a commission agreed upon between Dykes and the individual associate. Dykes also did not withhold taxes from the commission checks, opting rather to send Form 1099s to the sales associates at the end of the year. Dykes does not recall sending DePuy any information on how much he paid his sales associates.

Under the terms of the SRA, Health Systems was responsible for providing health insurance for Dykes, the sales associates and office staff. DePuy recommended a particular health insurance provider and urged its sales representatives to use that provider. Health Systems used that provider for a while, but later switched carriers to obtain a cheaper premium rate. DePuy raised no objection to the change.

Health Systems was solely responsible for its business accommodations. It paid rent on and maintained its own office space. It also paid for its office furniture and supplies.

Despite the fact that Dykes was, in many ways, running his own business, DePuy maintained some control over Health Systems. A clause in the SRA required Dykes to devote all of his professional efforts toward promoting only DePuy's products unless he obtained express written consent from DePuy. The SRA also stated that "Representative and Principal shall be guided by the DePuy Sales Policy Manual and other DePuy policies that are made known to Representative." DePuy generated marketing materials that Representatives were required to use. DePuy's Sales Advisory Committee produced directives containing advice on how to sell DePuy's products that it distributed to sales representatives. In addition, all customer billing was processed through DePuy's headquarters in Indiana.

Dykes and Health Systems were successful at selling DePuy's products. From July 1988 through December 1993, sales in DePuy New England grew over twenty-six percent, eight percent above DePuy's national average, and the territory's market share rose from two percent to five-and-a-half percent. In 1991, Dykes received additional territory from DePuy and entered into a new SRA, which contained similar terms to the 1988 agreement.

Despite this success, DePuy timely notified Dykes that his SRA would terminate on April 1, 1994. At the time of termination, Dykes had sold DePuy's products for over sixteen years and was four years away from qualifying for the Compensation Upon Termination program. Dykes alleges that DePuy terminated his SRA in order to prevent him from collecting his benefits. To support this assertion, Dykes introduced affidavits from several former sales representatives, including one who stated that DePuy's CEO had declared that "DePuy's sales representatives did not deserve their retirement compensation and that he would see that they did not get it."[1] Dykes has discovered that at least twenty-nine out of forty-four sales representatives were terminated prior to vesting.

After DePuy terminated its SRA with Dykes and Health Systems, Dykes became a sales associate on a month-to-month basis. During his first month under this new arrangement, Dykes was diagnosed with cancer and underwent related surgery. On May 12, Dykes informed DePuy that he would begin chemotherapy soon. Five days later, DePuy terminated Dykes as a month-to-month sales associate. Later in 1994, DePuy began replacing its regional sales representatives with "Territory Managers," who DePuy admits are employees.

On January 12, 1995, Dykes filed a complaint against DePuy in the United States District Court for the District of Massachusetts. When amended, his complaint alleged eleven counts, including violations of the Employee Retirement Income Security Act

---

1. DePuy argues that we should not consider these affidavits under Loc. R. 56.1, alleging that Dykes failed to present this evidence to the district court as part of his opposition to summary judgment. Dykes counters by noting that the documents at issue were docketed by the district court and therefore are properly part of our record on appeal under Fed. R.App. P. 30(b). We need not decide the issue because, even considering the contested evidence, Dykes has failed to raise a genuine issue of material fact deserving of trial.

("ERISA"), 29 U.S.C. § 1001 *et seq.*,[2] the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*,[3] and various state-law claims.[4]

On May 7, 1996, Dykes filed a motion to compel discovery, including information regarding whether other sales representatives had successfully claimed their Compensation Upon Termination. After a hearing, the magistrate judge granted Dykes's motion in part, but denied Dykes's request for information on DePuy's sales representatives.

On August 21, 1996, DePuy moved for summary judgment on all of Dykes's claims. Discovery closed roughly three months later, on November 30, 1996. A little more than a week after that, Dykes filed a motion for reconsideration of the magistrate judge's partial denial of his motion to compel. Dykes had not sought any extension to the discovery deadline, but blames his delay on inaccuracies in the information produced by DePuy. On December 13, Dykes filed his opposition to DePuy's motion for summary judgment.

After a hearing, the district court issued a memorandum and order granting DePuy's motion for summary judgment on all Dykes's federal counts and some of his state counts. The court dismissed without prejudice the remaining state-law claims.

On March 10, 1997, Dykes filed a motion seeking to delay the entry of final judgment until after the resolution of his motion for partial reconsideration. The next day, the magistrate judge denied Dykes's motion for partial reconsideration of his earlier discovery order. Three days later, the district court denied Dykes's motions for reconsideration of its grant of summary judgment and affirmed the magistrate judge's denial of his motion to compel. After final judgment issued, Dykes took this appeal.

**2.** The relevant provision of ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140 (1985).

**3.** The ADA provides, in relevant part: "No covered entity shall discriminate against a qualified individual with a disability because of the disabil-

## II. STANDARD OF REVIEW

■ The granting of summary judgment is reviewed *de novo*, the entire record being seen "in the light most. hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990) (citations omitted). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Summary judgment may properly be awarded against a party who, "after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). And summary judgment is not precluded by just any factual quibble: "The evidence manifesting the dispute must be 'substantial,' going beyond the allegations of the complaint." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975) (citations omitted). To prevail over a properly supported motion for summary judgment, a nonmoving party must establish the existence of a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman v. First Nat'l Bank*, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)).

■ We review the district court's denial of Dykes's motion to compel discovery and

ity of such individual in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1995).

**4.** DePuy answered and filed a counterclaim against Dykes, but that counterclaim was later dismissed by stipulation and plays no part in this appeal.

motion for partial reconsideration under an abuse of discretion standard. *See Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 91 (1st Cir.1996).

## III. DISCUSSION

Dykes raises three issues on appeal. First, whether the district court properly determined that he had failed to raise a genuine issue of material fact regarding whether he was an employee rather than an independent contractor. Second, whether the district court correctly granted summary judgment on his state-law claims alleging breach of the implied covenant of good faith and fair dealing. Third, whether the court below abused its discretion by denying his request for reconsideration of the magistrate judge's discovery ruling.

### A. *Dykes's Employment Status.*

■ Three of Dykes's contentions stand or fall on whether he was an employee rather than an independent contractor. Both ERISA (Count II) and the Massachusetts Antidiscrimination Statute, Mass. Gen. Laws Ann. ch. 151B (Count X),[5] protect employees, but neither extends to independent contractors. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 320–21, 112 S.Ct. 1344, 1346–47, 117 L.Ed.2d 581 (1992) (ERISA does not reach independent contractors); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 628–29 (1st Cir.1996) (Massachusetts Antidiscrimination Statute covers only employees, not independent contractors); *Comey v. Hill*, 387 Mass. 11, 438 N.E.2d 811, 814 (1982) (same). The parties agree that the ADA (Count XI) also applies only to employees.[6] Accordingly, in order to avoid DePuy's motion for summary judgment on these statutory claims, Dykes must produce evidence sufficient to allow a reasonable factfinder to conclude that he was a DePuy employee. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

■ To determine whether a plaintiff qualifies as a protected employee under ERISA or the Massachusetts Antidiscrimination Statute, this court will ordinarily utilize the traditional common law test of agency. *See Speen* 102 F.3d at 632. The test provides "no shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Darden*, 503 U.S. at 324, 112 S.Ct. at 1348–49 (quoting *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258, 88 S.Ct. 988, 990–91, 19 L.Ed.2d 1083 (1968)). The lower courts should consider:

> the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the

---

**5.** The relevant portion of this statute makes it illegal:

> For any employer ... to dismiss from employment ... or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation ... would impose an undue hardship to the employer's business.

Mass. Gen. Laws Ann. ch. 151B, § 4(16).

**6.** This circuit has not yet decided an appeal directly presenting the question whether the ADA covers only employees, although we have observed that the ADA and Title VII, which does not protect independent contractors, use a similar definition of the term "employer." *See Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n*, 37 F.3d 12, 16 (1st Cir.1994). Other federal courts have held expressly that the ADA does not protect independent contractors. *See Birchem v. Knights of Columbus*, 116 F.3d 310, 312 (8th Cir.1997); *Johnson v. Equitable Life Assurance Soc'y of the United States*, No. 96–C–2418, 1997 WL 417409, at *4 (N.D.Ill. July 22, 1997); *Aberman v. J. Abouchar & Sons, Inc.*, No. 95–C–5423, 1997 WL 51601, at *1 (N.D.Ill. Feb. 4, 1997); *Robinson v. Bankers Life & Cas. Co.*, 899 F.Supp. 848, 849 (D.N.H.1995). The parties' agreement on this point obviates any need for us to decide the question here.

hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323–24, 112 S.Ct. at 1348 (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989)).

■ We shall employ the same common law agency test in assessing Dykes's status for purposes of his ADA claim. A major reason given by the Supreme Court for its adoption of the common law test in the ERISA context was ERISA's "completely circular" definition of the term "employee." *Id.* at 323, 112 S.Ct. at 1348. That definition of "employee"—"any individual employed by any employer," 29 U.S.C. § 1002(6)—is virtually the same as the ADA's definition—"an individual employed by an employer," 42 U.S.C. § 12111(4). Hence the same common law agency standards seem appropriate for deciding whether Dykes was an employee for ADA purposes. *See also Birchem,* 116 F.3d at 312 (applying the common law test to an ADA claim).

Turning to the present case, the facts relevant to Dykes's claim to be DePuy's employee are much the same as those that we considered in *Speen.* In that case, applying the common law test of agency, this court held that Speen, a traveling salesman, had failed to raise a triable issue regarding his asserted employee status. *See Speen,* 102 F.3d at 632–34. Finding Speen to be an independent contractor, we affirmed judgment as a matter of law for the defendant on Speen's ADEA, ERISA, and state discrimination claims. *See id.* at 634.

■ Like Speen, Dykes enjoyed broad control over his day-to-day business: he set his own hours, paid his own salary, and decided where and when to make sales calls. Neither salesman had to report regularly to a corporate headquarters. Both Dykes and Speen sold the same brand of product for over fifteen years. Both conducted business through their own corporate entities and both were paid on a commission basis. Both received Form 1099s rather than W–2s for federal tax purposes.

Further, because Dykes ran his own business, he enjoyed greater freedom than Speen in several important ways. The evidence demonstrates that Dykes controlled the employment and salaries of his office staff and sales associates.[7] Dykes and Health Systems rented and maintained office space and acquired office furniture. Also, whereas Speen was required to phone his sales numbers in to the home office daily, DePuy had no knowledge of Dykes's expenses and profits. Moreover, unlike Speen, Dykes had a signed written contract that clearly stated that he was an independent contractor, and that "[a]ll personnel of Representative [Health Systems] shall be employees, or independent contractors of Representative, and not of DePuy."

Dykes tries to escape from under the shadow of *Speen* by arguing that DePuy maintained more control over his business than Crown Clothing did over Speen's. Dykes does not persuade us. Several of the arguments that Dykes makes to distinguish *Speen* are not supported by the record.[8] Some of his other arguments cut in both directions. For example, Dykes argues that internal memoranda and marketing di-

7. Although Dykes admits that he controlled his administrative office staff, he argues that, as a practical matter, he could not fire sales associates without DePuy's approval. There is evidence, however, that when Dykes fired a sales associate without DePuy's approval and the associate wrote a complaint letter to DePuy, DePuy's Vice President of Sales responded by forwarding the sales associate's letter to Dykes, accompanied by a note saying that: "[t]his is of course *totally your call,* but I would appreciate your comments so that I can intelligently respond to [the terminated associate's] letter" (emphasis added). Since Dykes does not introduce countervailing evidence indicating the need for approval, we need not assume the existence of a factual issue

concerning the point. *See Rubinovitz v. Rogato,* 60 F.3d 906, 911 (1st Cir.1995) (a court should not indulge a nonmoving party's inferences if they do not "flow rationally from the underlying facts").

8. For example, Dykes argues that he was obligated to devote all of his professional efforts towards selling DePuy's products exclusively. However, the SRA contained an escape clause allowing Dykes to engage in other business activities if DePuy gave its prior written consent. The SRA states that "[t]his consent shall not be unreasonably withheld."

rectives produced by DePuy limited his business discretion greatly. Dykes supports this argument by claiming that DePuy required him to hire a medical specialist if he wanted to sell spine products. This piece of evidence cuts both ways, as it demonstrates that Dykes had discretion over which products he wished to sell. *See Johnson v. Equitable Life Assurance Soc'y of the United States*, 1997 WL 417409, at *3 (N.D.Ill. July 22, 1997) (finding that discretion over which products to sell points toward independent contractor status).

Dykes insists that the Compensation Upon Termination program was a retirement program used by DePuy to control its sales representatives to such a degree that they effectively became employees of DePuy. The program, however, depended on several contingencies prior to vesting, and while it undoubtedly provided a strong incentive for sales representatives to want to maintain their contractual relationship with DePuy, it does not overcome the many indicia that that relationship was one of independent contract, not employment.

We conclude that a reasonable factfinder could not find on this record that DePuy was Dykes's employer.[9] Dykes has pointed to no case law in which a court has held, on similar facts, that an employer-employee relationship existed. Under the multi-factored common law test of agency, and in light of *Speen*, Dykes has failed to raise genuine factual issues regarding his employment status. Since as a matter of law Dykes was an independent contractor, the district court properly granted summary judgment on Dykes's ERISA, ADA, and state antidiscrimination claims.

**B.** *Dykes's Allegations Regarding Breach of the Implied Covenant of Good Faith and Fair Dealing.*

■ Dykes alleges that DePuy improperly terminated his relationship in bad faith in order to avoid paying him his Compensation Upon Termination (Count I). When facing a claim that does not arise under the Constitu-

tion or the laws of the United States, a federal court must apply the substantive law of the forum in which it sits, including that state's conflict-of-laws provisions. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). This principal applies with equal force to a state-law claim brought under supplemental jurisdiction, such as this. *See Bi–Rite Enters., Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir.1985) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). Thus, we must determine what law a Massachusetts court would apply.

■ If two contracting parties express "a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy and as long as the designated State has some substantial relation to the contract." *See Steranko v. Inforex, Inc.*, 5 Mass.App.Ct. 253, 362 N.E.2d 222, 228 (1977) (citations omitted). The SRA signed by Dykes and DePuy states that it is "governed by and interpreted in accordance with the laws of the State of Indiana." Neither of the parties here argues that application of Indiana law would contravene public policy. Since DePuy is headquartered in Indiana, that state bears a "substantial relation to the contract." *Id.* Accordingly, if Dykes's claims for breach of good faith and fair dealing arise from the SRA, we will apply Indiana law.

Dykes seeks to avoid this result by arguing that Count I of his complaint somehow presents a cause of action for wrongful discharge distinct from Dykes's contract and that therefore Count I should be evaluated under the substantive law of Massachusetts. We believe that Dykes's claim can properly be understood only as a claim for breach of an implied term of the SRA, the contract governing his relationship with DePuy. For that reason, it is governed by Indiana law.

In order to support his contention that his "wrongful termination" rests solely on Mas-

---

**9.** Dykes points to several other factors of his relationship with DePuy as at least raising a genuine issue as to whether he was DePuy's employee. We have reviewed these matters and remain satisfied that there is no basis for a factfinder to determine that Dykes was an employee.

sachusetts's law, Dykes relies on a line of Massachusetts cases that have held that an employee at-will who is fired without good cause may recover amounts wrongfully withheld by an employer.[10] *See Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1255–56 (1977). It is true that Dykes's arrangement was "at-will," in that under the SRA either party could withdraw upon giving ninety days' notice. However, *Fortune*, the case that created this exception to the general presumption that an at-will employee may be fired for any reason or no reason at all, states expressly that "termination by the employer of a contract of employment at will which is motivated by bad faith or malice ... *constitutes a breach of the employment contract.*" *Id.* This language belies any notion of a cause separable from the employment contract; rather the Massachusetts Supreme Judicial Court appears to have infused Massachusetts express or implied at-will employment contracts with an implied term that they be executed in good faith. If there is a Massachusetts legal requirement that cabined DePuy's ability to terminate its arrangement with Dykes it would arise as a covenant implied within the SRA itself.[11] Dykes alleges that the bad faith reason for terminating him was DePuy's desire to avoid paying Dykes any money under the Compensation Upon Termination program. Since the program was created by the SRA, any rights that Dykes might have are inextricably bound up with that agreement. We conclude that a Massachusetts court, following the SRA's choice of law provision, would look to Indiana substantive law to evaluate Count I of Dykes's complaint.

Further, the parties agree that Dykes's two separate allegations of breach of the duty of good faith and fair dealing, Counts III and VIII, both arise under the SRA. In light of our discussion above, then, we apply Indiana law for the purposes of determining Dykes's rights relative to those claims as well.

■ The SRA allows either party to terminate the agreement for any reason or no reason, provided only that the terminating party give ninety days' notice. Dykes does not argue that DePuy provided insufficient notice. DePuy, therefore, was within at least its express contractual rights in terminating its arrangement with Dykes.

■ As noted, courts in some states limit employers' discretion to sever at-will employment relationships by reading a duty of good faith and fair dealing into at-will employment contracts. *See, e.g., Mitford v. de Lasala*, 666 P.2d 1000, 1007 (Alaska 1983); *Fortune*, 364 N.E.2d at 1255–56 (Massachusetts); *Hall v. Farmers Ins. Exch.*, 713 P.2d 1027, 1029–30 (Okla.1985). Indiana courts, however, have taken the position that there is no general implied duty of good faith and fair dealing in at-will employment contracts. *See Mehling v. Dubois County Farm Bureau Coop. Ass'n, Inc.*, 601 N.E.2d 5, 9 (Ind.Ct. App.1992) (declaring that "Indiana does not recognize a covenant of good faith and fair dealing in [the at-will employment] context"); *Hamblen v. Danners, Inc.*, 478 N.E.2d 926, 929 (Ind.Ct.App.1985) (same); *see also Bob Nicholson Appliance, Inc. v. Maytag Co.*, 883 F.Supp. 321, 327 (S.D.Ind.1994) (observing that "[i]t is well-known that Indiana does not recognize an implied good faith and fair dealing in contracts"). The Indiana Supreme Court has declared that, if contract language is clear, "[i]t is not the province of the courts to require a party acting pursuant to such a

---

**10.** While Dykes was an independent contractor, *supra*, we shall assume without deciding that the implied duty that some states recognize will apply in cases of independent contract as well as to a strict employer-employee relationship.

**11.** Our interpretation accords with the language used in the other cases in this line, including the cases upon which Dykes relies. *See, e.g., Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 438 N.E.2d 351, 354 (1982) (framing the issue on appeal as whether the defendant was liable "for breach of contract"); *Gram v. Liberty*

*Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 28 (1981) ("*Gram I*") ("The question, then, is whether we should allow recovery for breach of a contract of employment at will...."); *Cataldo v. Zuckerman*, 20 Mass.App.Ct. 731, 482 N.E.2d 849, 855 (1985) (stating that a cause of action exists "where a breach of the implied covenant of good faith and fair dealing *in an 'at will' employment contract* operated to deprive the employee [of an identifiable benefit]") (emphasis added).

contract to be 'reasonable,' 'fair,' or show 'good faith' cooperation." *First Fed. Sav. Bank v. Key Markets, Inc.,* 559 N.E.2d 600, 604 (Ind.1990).

The primary exception to this rule is that a court may imply a duty of good faith if it is necessary to "effectuate the clear intent of the parties." *Prudential Ins. Co. of Am. v. Crouch,* 606 F.Supp. 464, 469 (S.D.Ind.1985) (interpreting Indiana law); *see also Key Markets,* 559 N.E.2d at 605; *Hamlin v. Steward,* 622 N.E.2d 535, 540–41 (Ind.Ct. App.1993). In the present case, however, the language of the SRA is unambiguous. It sets forth with clarity the conditions precedent to claiming under the Compensation Upon Termination program. It expressly provides that the program "shall not restrict the right of DePuy to terminate the Representative" and that "termination before Representative and Principal have met the conditions precedent" will leave no rights under the agreement. In a situation such as this one, we believe that *Key Markets* runs contrary to implying a duty of good faith and fair dealing and that, therefore, Dykes's state claims must fail.

Dykes relies upon an Indiana intermediate appellate court decision to argue that Indiana courts are changing their traditional view of contract interpretation. *See Weiser v. Godby Bros., Inc.,* 659 N.E.2d 237 (Ind.Ct.App. 1996). In *Weiser,* the court reversed a lower court's grant of summary judgment in favor of a defendant who told an at-will employee to "[s]ign [a new contract] or clean out your desk and you will be fired." *Id.* at 239. A one-judge plurality stated that, "[a]lthough the contract terms may be wholly unambiguous and, thus, not amenable to a fair dealing requirement, the formulation of that contract is susceptible to a good faith/fair dealing analysis." *Id.* We are not persuaded.

First, *Weiser* applied the fair dealing analysis to the formation of the contract only; the judge expressly noted that there is no general fair dealing requirement under state law. Since Dykes does not argue that he was coerced into signing the SRA, *Weiser* is inapposite. Second, the other two judges on the panel did not join in the good faith and fair dealing analysis used by the plurality

judge, rendering *Weiser* of "no precedential value." *Robinson v. Century Personnel, Inc.,* 678 N.E.2d 1268, 1270 n. 2 (Ind.Ct.App. 1997). Third, another Indiana appellate court has recently disavowed *Weiser,* calling its continued viability into question. *See id.* (stating, "[i]n any event, we agree with the dissent in *Weiser* ").

We conclude that the applicable Indiana law precludes Dykes from recovering on his good faith claims. Although we need not reach the question, we also agree with the district court that Dykes could likely not recover under Massachusetts law either. This is so because Massachusetts allows plaintiffs in Dykes's position to recover only "reasonably ascertainable future compensation based upon [ ] past services." *Gram I,* 429 N.E.2d at 29. Thus, the compensation that the plaintiff seeks must be "specifically related to a particular past service." *McCone v. New England Tel. & Tel. Co.,* 393 Mass. 231, 471 N.E.2d 47, 50 (1984). In this case, Dykes was four years away from qualifying for payment under DePuy's Compensation Upon Termination program. Moreover, he had to meet a yet-to-be-determined sales quota in his final year. In these circumstances, it appears that Dykes's claim would be denied by Massachusetts courts as overly speculative. *Cf. Gram v. Liberty Mut. Ins. Co.,* 391 Mass. 333, 461 N.E.2d 796, 798 (1984) ("*Gram II* ") (denying a plaintiff recovery for lost "career credits," which were bonus payments "based upon the length of Gram's service as a sales representative").

We conclude that the district court properly granted summary judgment on Dykes's good faith claims, and affirm as to Counts I, III & VIII.

## C. *Dykes's Motion for Reconsideration of the Magistrate Judge's Discovery Order.*

Dykes also appeals from the magistrate judge's denial of his request to compel DePuy to release information relating to whether any sales representatives successfully claimed their Compensation Upon Termination benefits. Dykes sought this information to establish that DePuy's stated reasons for his termination were pretextual. Dykes claims that this information is "directly relat-

ed to claims upon which the District Court granted summary judgment." We cannot agree.

Even if Dykes were to obtain the requested discovery and DePuy's asserted reasons for terminating him were pretextual, he could still not recover. Not being an employee, he is not protected by federal and state antidiscrimination statutes. And under applicable state law he may not recover for breach of an implied duty of good faith and fair dealing. No viable claims remain.[12] Hence, any possible abuse of discretion in denying Dykes's motion to compel was harmless.

*Affirmed.* Costs to appellee.

---

12. We have affirmed the district court's grant of summary judgment on Counts I, II, III, VIII, X and XI of Dykes's amended complaint. Dykes consented to the dismissal of Counts IV, V and VI. Dykes does not challenge in this appeal the district court's dismissal without prejudice of Counts VII and IX pursuant to 28 U.S.C. § 1367(c).