**Myrtle THOMAS, Plaintiff,**

v.

**EASTMAN KODAK COMPANY, Defendant.**

**Civil Action No. 96–10890–WAG.**

United States District Court, D. Massachusetts.

Sept. 22, 1998.

Marisa A. Campagna, Campagna & Riley, Boston, MA, for Plaintiff.

Jon M. Nelson, Michael A. Fitzhugh, Fitzhugh & Associates, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

Myrtle Thomas ("Thomas"), plaintiff in this employment discrimination case, was laid off by Eastman Kodak Company ("Kodak"), defendant. Kodak selected Thomas for layoff based on her past performance evaluations; since these evaluations were racially biased, plaintiff argues, her layoff was illegal under Title VII of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 259, *codified as amended at* 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII"). Defendant, moving for summary judgment, argues that plaintiff's claims are time-barred or, in the alternative, lacking evidence of racial animus sufficient to reach a jury. The Court finds that plaintiff's claim, while timely, cannot survive summary judgment. We therefore grant defendant's motion.

### Facts

In deciding a motion for summary judgment, "we state the facts in the light most favorable to the nonmoving party, indulging all inferences in that party's favor." *Dykes v. Depuy, Inc.*, 140 F.3d 31, 33 (1st Cir.1998). Plaintiff alleges a number of incidents and statements that defendant denies or does not discuss; in deciding this motion, we accept plaintiff's version in all cases.

Plaintiff is a black woman. Kodak hired her in 1974 to work in Rochester, New York. In 1980, Thomas was promoted to Customer Support Representative ("CSR"). She was trained and transferred to the Office Imaging division in the Wellesley, Massachusetts office. Thomas worked in the Wellesley office until she was laid off in March 1993. In July 1993, Thomas filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Right to Sue Letter on February 5, 1996. Plaintiff sued in this Court on May 2, 1996.

CSRs were sales, marketing and customer support personnel. Each CSR supported customers in an assigned territory who owned Kodak copiers and other equipment. CSRs trained customers and other personnel in use and maintenance of Kodak's products, helped salespeople perform installations, and worked to keep customers satisfied with Kodak imaging equipment and service. Six CSRs worked in the Wellesley office. For the thirteen years Thomas there, she was the only black CSR.

In 1993, Kodak decided to implement a reduction in force in its North American office imaging divisions. Kodak planned to eliminate approximately 80–100 positions, including two CSRs in the Wellesley office. To decide whom to lay off, defendant used the Performance Appraisal Ranking process, or "PAR process." The PAR Process was based on each employee's last three Performance Appraisals ("PAs"). Supervisors completed annual PAs for each of their employees. Kodak used the PA system to "reward each individual's job performance appropriately." Def.'s Summ. J. Mem., Ex. O. Further, defendant "expected supervisors to use appraisals for," among other things, "determining who should be promoted, transferred, demoted, terminated, laid off, and re-employed." *Id.* The PA included written comments and numerical ratings in several areas. Each employee also received an overall rating, from a low of one to a high of seven. In the PAR process, defendant applied employees' overall ratings to a formula, weighting the most recent two evaluations. Thomas's PAR process number was the lowest in her group; she was laid off along with the second-lowest-rated CSR, a white woman.

Generally speaking, Thomas was a good employee. Before 1990, plaintiff was supervised and evaluated by District Sales Manager Richard Austin, Sales Managers Garrie O'Neill and Katherine Sullivan, and briefly by Customer Service Manager Tim O'Connor. She received positive evaluations, as well as awards and bonuses from Kodak. Her 1988 and 1989 PA ratings were respectively five and six. After her 1989 evaluation, Thomas was given a grade change from

K4 to K6, increasing her salary by $19.00 per week without changing her job description.

In 1989, Kodak created the position of Customer Support Manager. When Thomas asked to be considered for this position, she was told she was not at the correct grade level. Instead, Claire Flannery ("Flannery"), who was then working as a secretary, became the Customer Support Manager, and began to supervise the Wellesley CSRs including Thomas. Problems in the working relationship developed between Flannery and Thomas. Plaintiff alleges a series of incidents between the two; we include four examples. When Flannery and Thomas were to give a customer presentation together, Flannery took over the presentation and left no time for Thomas. When Thomas asked what happened, Flannery said she got a little carried away. Flannery scheduled a customer appointment for Thomas, but gave Thomas the wrong time. Thomas was over two hours late. When plaintiff confronted her, Flannery denied giving the wrong time. Thomas then replayed Flannery's voicemail message to Flannery and others in the office. Flannery finally admitted she was wrong, but refused to write the customer to clarify why Thomas had been late. Flannery did not train Thomas on the office computer as she did other employees. Flannery scheduled meetings and insisted on employees' attendance. On one occasion, when Thomas attempted to leave a meeting to make a customer visit, Flannery became upset and physically blocked the door.

Flannery's gave plaintiff lower PA ratings than had her previous supervisors. Flannery also rated Thomas lower than other CSRs. In 1990, Flannery gave Thomas an overall PA rating of three, citing a failure to file weekly and quarterly reports. Before Flannery took over, CSRs were not required to submit such reports. During Flannery's tenure, none of the other Wellesley CSRs received an overall PA rating below four. Flannery told Thomas she could score no higher than a three because she had recently changed grades. Kodak had no policy that a grade change would result in lower ratings. Thomas refused to sign her 1990 PA, believing it did not fairly reflect her work. In 1991 and 1992, Flannery gave Thomas increasing PA ratings of four and five. Thomas did not see or sign the 1992 PA. Thomas received pay raises of $30.00 and $29.00 per week in 1991 and 1992.

In addition to her performance reviews, plaintiff submits the following events and situations as evidence of unlawful discrimination. When plaintiff was transferred to Wellesley, Kodak did not fly her to Massachusetts, as it had other transferred employees. Instead, Thomas was told to drive a car that had been requested by Richard Austin, her new supervisor. The car was in disrepair, requiring a new muffler. Though other employees had two weeks in a new location before reporting to work, plaintiff was told to report right away.

As part of plaintiff's move benefits, Kodak provided storage for her belongings. The warehouse burned in 1981, destroying virtually all of Thomas' belongings. Thomas gave Austin an inventory of her losses; in response, he asked, "Are you rich or something?" Before Thomas was reimbursed, another Kodak employee encouraged her to change her inventory listing. Defendant did not reimburse Thomas for five years.

A few months after Thomas began working in Wellesley, she was standing with a group of employees when Austin introduced two visiting sales managers. Austin introduced everyone in the group except Thomas.

In 1983, Thomas passed a co-worker in the hallway outside the department manager's office. The co-worker asked the manager if plaintiff was "here to do the cleaning."

Thomas lost a gold bracelet at work. A co-worker announced finding it just before a sales meeting, as other employees arrived. Thomas claimed the bracelet, and described it at his request. He refused to return the bracelet until he had confirmed that it did not belong to another, white female employee.

Plaintiff believes she was overlooked when Kodak created the Customer Service Manager position. She was studying for a master's degree in business, and had more seniority as a CSR than Flannery, who was promoted.

## Timeliness

Defendant first argues that plaintiff's claim is time-barred. Plaintiff's case hinges on the three performance appraisals ("PAs") she received from Flannery. Thomas alleges that Kodak dismissed her because of low numbers on these PAs, and that Flannery's racial bias lowered these numbers. Defendant argues that, since Flannery completed these PAs before the window of examination allowed by Title VII, plaintiff cannot challenge their validity and thus has no case.[1] Plaintiff responds that defendant waived this argument by omitting it from the answer. *See Zipes v. Trans World Airlines*, 455 U.S. 385, 392–394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (holding Title VII timely filing requirement nonjurisdictional and therefore subject to waiver). Whether defendant's answer sufficiently reserved this argument is a question mired in the murky world of civil procedure and responsive pleadings. Since defendant's argument fails on the merits, we do not decide whether its answer language sufficiently preserved the issue.

■■■■ The Court holds that an employee's receipt of a performance review does not, standing alone, mark the beginning of the 300–day Title VII window of 42 U.S.C. § 2000e–5(e)(1).[2] Since our circuit has not squarely addressed this question, we look for guidance elsewhere. Closest to the facts at bar we find *Colgan v. Fisher Scientific Co.*,

935 F.2d 1407 (3d Cir.1991) (en banc).[3] In *Colgan*, defendant fired plaintiff after a highly negative performance review. Plaintiff filed his EEOC claim in time to challenge his termination but not the performance review. The Third Circuit held the performance review not barred by the 300–day window, stating that "an alleged unlawful employment practice, here the performance evaluation, must have inflicted harm which was or should have been noticed, or it will not have triggered the limitations period." *Id.* at 1418. Although Colgan's performance review graded him "below requirements" and warned that "action will be taken" if he did not quickly improve, *id.* at 1410, the court found that Colgan did not receive the notice needed to start the limitations period:

> The [review] clearly signaled that Colgan had an opportunity to redeem himself by an improved performance .... [defendant] had neither established an official position nor given Colgan explicit notice of its allegedly unlawful employment practice when it reviewed his performance .... The performance evaluation had no immediate consequence on Colgan's employment, such as a loss of seniority, nor did it alert Colgan to the possibility that consequences would flow from it without an opportunity for him to improve his performance.

*Colgan*, 935 F.2d at 1419–1420.[4]

Cases in this circuit, without stating this standard, have conformed to its contours. In

1. The parties disagree on the Title VII window's correct length. We need not resolve the dispute, as both parties would have us reach the same result. Plaintiff filed her EEOC charge within the minimum 180 days of her termination, but more than the maximum 300 days after her most recent evaluation.

 Likewise, the 1991 amendments to Title VII do not affect the outcome of this case. Plaintiff received her 1990 and 1991 performance evaluations before the effective date of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1075, which "effect[ed] a major expansion in the relief available to victims of employment discrimination." *DeNovellis v. Shalala*, 124 F.3d 298 (1st Cir.1997), quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 254–55, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). While use of these earlier evaluations might prevent plaintiff from recovering certain damages, it cannot bar her from establishing liability and winning back pay. Since we dispose of the case before reaching damages, we do not decide the status of the 1990 and 1991 evaluations.

 Finally, plaintiff neither alleges a continuing violation nor asks for the Title VII window to be equitably tolled.

2. In general, we discuss the maximum time period available to Massachusetts plaintiffs. The Commonwealth has its own anti-discrimination agency, and is therefore a "deferral jurisdiction" under Title VII. *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181–82 (1st Cir.1989). Title VII plaintiffs in deferral jurisdictions have up to 300 days to file with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1) (West 1994 & Supp.1998).

3. Though the *Colgan* majority is on all fours against defendant, the Court's attention was first directed to *Colgan* by defense counsel at oral argument. His reference to this case was a fine example of the professionalism the Court expects from members of its bar.

4. The *Colgan* court elegantly reconciled the Supreme Court's case law with its ruling, *see id.* at 1415–1421, and we need not repeat its reasoning here.

*Provencher v. CVS Pharmacy, Div. Of Melville Corp.*, 145 F.3d 5 (1st Cir.1998), the court time-barred plaintiff's sexual harassment gender discrimination claims. Kodak argues that *Provencher* requires time-barring of Thomas' claim here; viewed through the lens of *Colgan*, however, defendant's reliance is misplaced. In *Provencher*, the plaintiff not only should have known, but actually knew that actionable harassment was taking place. The supervisor's actions in *Provencher* were so extreme that plaintiff could be charged with knowledge of harmful sexual harassment.[5] In addition, Provencher himself recognized the harm which defendant inflicted, at one point taking a leave of absence to recover. Since Provencher knew of the harm in question, the 300–day window applied to his claims.

Defendant's citation of *DeNovellis v. Shalala*, 124 F.3d 298 (1st Cir.1997) is similarly misplaced, for two reasons. First, DeNovellis attempted to collect damages under the Civil Rights Act of 1991 for acts that occurred wholly before that law's enactment. *See DeNovellis*, 124 F.3d at 306. Since plaintiff was never fired and lost no wages, he had no pre–1991 claim. Second, the violation DeNovellis alleged—assignment to duties for which he was unqualified, with intent to discredit him in the office—clearly had an "immediate consequence" on plaintiff's employment. Such major employment actions are not included in the *Colgan* standard.

■ When held to the notice standard explicated in *Colgan* and impliedly followed in First Circuit cases, plaintiff is entitled to avoid the time bar and include in her case all three evaluations used in the PAR. Plaintiff could not, and should not, have known that Flannery's evaluations had inflicted harm on her. Kodak, like many employers, considers

performance evaluations to be highly confidential.[6] As a result, plaintiff had no way to compare her evaluations to those of her co-workers. She thus could not realize that her PA numbers under Flannery fell below those of her co-workers, and cannot be charged with notice of a possible Title VII violation.[7]

In addition to prevailing under relevant precedent, plaintiff's position takes the only realistic view of the American workplace. Adopting defendant's argument would put an undue burden on employees and the employment relationship, inducing employees to file charges within 300 days of any action that might be discriminatory and that could lead to future negative results. The Supreme Court has expressed concern about the "disruptive implications" of allowing too many challenges to neutral procedures building on past discriminatory acts:

> [a] given plaintiff could in theory sue successively for not being promoted, for being demoted, for being laid off, and for not being awarded a sufficiently favorable pension, so long as these acts—even if nondiscriminatory in themselves—could be attributed to [the original, allegedly discriminatory act].

*Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 912, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). This case is the flip side of the *Lorance* Court's concern. If we apply the time bar to plaintiff's PAs, then we require a given plaintiff to file EEOC charges successively for each performance evaluation, informal feedback from a supervisor, or office rumor, so long as these events—even if nonharmful in themselves—might be informed by racial animus and could someday contribute to a later, harmful result. This requirement would surely disrupt the American

---

5. Plaintiff's female supervisor "called him 'fag,' and 'queer,' said she would make him 'a real man,' fondled herself and disrobed in his presence, and touched his genital area, among other inappropriate contact." *Provencher*, 145 F.3d at 13.

6. Kodak so insists on the confidentiality of its PAs that, in discovery for this litigation, it released to plaintiff only PAs with employees' names deleted.

7. Though Thomas refused to sign two of the three PAs, she is not therefore charged with knowledge of future harm. The pervasive evidence of a personality conflict between Thomas and Flannery, who wrote the evaluations, could easily explain her refusal to sign. And while Thomas may have been unhappy with her evaluations, so are many if not most employees. We cannot accept that plaintiff's meaningless decision to withhold her signature equals an understanding of the PA's future effects.

workplace at least as much as the successive suits of *Lorance.*

### Summary Judgment of Employment Discrimination Claims

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the nonmoving party.'" *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 842 (1st Cir.1993), quoting *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993).

In applying this standard to plaintiff's motion, we turn to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its "familiar burden-shifting framework." *Mulero–Rodriguez v. Ponte,* 98 F.3d 670, 673 (1st Cir.1996). Under that framework, plaintiffs must first establish a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. In cases arising from reductions in force, plaintiff's prima facie case has four elements. She must establish that she (1) is a member of a protected class, (2) met the employer's legitimate employment expectations, and (3) was laid off. Finally, she must establish that (4) the employer did not treat members of the protected class neutrally, or retained persons outside the protected class in the same position. *See Udo v. Tomes,* 54 F.3d 9, 12 (1st Cir.1995), citing *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 842 (1st Cir.1993).

Plaintiff has established her prima facie case of discrimination. The plaintiff's prima facie burden in Title VII cases is "not onerous." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991). The first and third elements are obviously satisfied. While Kodak argues that Ms. Thomas' performance was not as good as that of her co-workers, defendant does not contend that plaintiff failed to meet legitimate job expectations; the second element is therefore undisputed. The fourth element is met because, after the layoff, the four CSRs in the Wellesley office were uniformly white.

Once plaintiff establishes her prima facie case, *McDonnell Douglas* shifts the burden of production to the defendant. "Under the *McDonnell Douglas* scheme, '[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Hicks,* 509 U.S. at 506, 113 S.Ct. 2742, quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To meet this burden, defendant must allege "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742, citing *Burdine,* 450 U.S. at 254–255, 255 n. 8, 101 S.Ct. 1089. While the burden of production shifts to the defendant, the ultimate burden of persuasion remains at all times with the plaintiff. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742, citing *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

Defendant has met its burden of production. The defense argues that plaintiff was fired because her PAR ratings were below those of her retained co-workers, and her ratings were lower because her performance was itself below their level. Defendant does not call plaintiff a poor performer, saying only she was not rated as well as the employees it retained. Indeed, plaintiff does not contend that Kodak's PA system, or its PAR layoff process, were themselves discriminatory. Defense has alleged a legitimate, nondiscriminatory reason for plaintiff's layoff, satisfying its *McDonnell Douglas* burden.

"'If the defendant carries the burden of production, the presumption raised by the prima facie case[ ] is rebutted,' and 'drops from the case.'" *Hidalgo v. Overseas Condado Insurance Agencies, Inc.,* 120 F.3d 328, 334 (1st Cir.1997), quoting *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742. The burden then returns to plaintiff one more time, and "'merges with the ultimate burden of persuading the court that ... [the plaintiff] has been the

victim of intentional discrimination.'" *Hidalgo*, 120 F.3d at 335, quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. To prevail, plaintiff must demonstrate that she lost her job (1) not because of defendant's proffered reason, but (2) instead because of illegal racial discrimination. *See Udo v. Tomes*, 54 F.3d 9, 13 (1st Cir.1995). While this test has two distinct prongs, plaintiff may use the same evidence to support both conclusions. *See id.*

Plaintiff argues she need present only evidence of pretext to defeat summary judgment reach the jury. This argument cannot prevail, however, as it was squarely rejected by the Court of Appeals in *Woods v. Friction Materials, Inc.*, 30 F.3d 255 (1st Cir.1994). The EEOC, amicus curiae in *Woods*, argued that the Supreme Court in *Hicks* eliminated the need to present evidence of discriminatory animus on summary judgment. *See Woods*, 30 F.3d at 260 n. 3. In *Hicks*, the Court of Appeals held that, if the factfinder found pretext in defendant's explanation for an employment action, judgment must go to the plaintiff. *See Hicks v. St. Mary's Honor Center*, 970 F.2d 487, 493 (8th Cir.1992). Reversing, the Supreme Court noted in dicta that the factfinder could conclude, though it was not so required, that evidence of pretext was by itself enough:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicions of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "no additional proof of discrimination is required."

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting *Hicks*, 970 F.2d 487, 493 (8th Cir.1992) (footnote omitted). In *Woods*, the EEOC argued that, in order for the factfinder to have the choice the *Hicks* Court described, evidence of pretext alone must allow plaintiffs to survive summary judgment. *See*

*Woods*, 30 F.3d at 260 n. 3. The Court of Appeals disagreed, holding instead that:

> [T]he Supreme Court envisioned that some cases exist where a prima facie case and the disbelief of a pretext could provide a strong enough inference of actual discrimination to permit the fact-finder to find for the plaintiff. Conversely, we do not think that the Supreme Court meant to say that such a finding would always be permissible.... The strength of the prima facie case and the significance of the disbelieved pretext will vary from case to case depending on the circumstances. In short, everything depends on the individual facts.

*Woods*, 30 F.3d. at 260 n. 3. The Court of Appeals followed *Woods* in *Barbour v. Dynamics Research Corp.*, 63 F.3d 32 (1st Cir. 1995). In *Barbour*, the plaintiff again argued "that *Hicks* precludes summary judgment where there is sufficient evidence to conclude that the defendant's proffered reasons are a pretext." *Barbour*, 63 F.3d at 38. The court held this argument "foreclosed by our decision in *Woods* ...." *Barbour*, 63 F.3d at 39. Citing the *Woods* language quoted above, the court held that "whether the plaintiff relies solely on his prima facie case and evidence of pretext or has additional evidence of specific intent as well, the plaintiff must always adduce evidence sufficient for a rational jury to conclude that the employer's action was motivated by an intent to interfere" with a protected right. *Id.*

▌ In light of the Court of Appeals' statements in *Woods* and *Barbour*, we agree with other courts in this District that, even on summary judgment, "[e]vidence of pretext alone is not enough." *Compton v. GTE Government Systems Corp.*, No. 93–11383, 1995 WL 791938, at *4 (D.Mass. Dec.7, 1995); *see also Blick v. Pitney Bowes Mgmt. Svcs., Inc.*, No. 93–11573, 1995 WL 791945, at *4 (D.Mass. Dec.26, 1995), *Wooster v. Abdow Corp.*, No. 94–30060, 1996 WL 131143, at *3 (D.Mass. March 21, 1996). We therefore hold that to survive summary judgment, the plaintiff must introduce sufficient evidence to support two additional findings: first, the defendant's stated reason for the adverse job action was pretextual, and second, the true reason arose from racial discrimination. *See*

*Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir.1994), citing *Woods v. Friction Materials, Inc.*, 30 F.3d 255 (1st Cir.1994). Here, plaintiff must allege credible reason to decide that she lost her job not only because Flannery unfairly lowered her performance appraisals, but also that Flannery was motivated by racial animus.

**Application of standard to plaintiff's case**

■ The plaintiff met the first part of her burden. Based only on the evidence presented so far, a reasonable fact finder could determine that Flannery's reasons for lowering plaintiff's PA ratings were pretextual. The immediate and sharp drop in plaintiff's PA rating under Flannery, together with evidence of a personality conflict between Flannery and plaintiff, is probably sufficient ground for such a determination.

■ The second, racial animus portion of plaintiff's burden is a different story. In determining whether the facts of this case reach the legal threshold needed to survive summary judgment, we look to previous employment discrimination cases decided in this circuit. The cases listed in the following paragraphs are in the same procedural posture as the one at bar, and confront substantially similar issues. They were all decided on summary judgment motions by defendant employers. In each of these cases, the plaintiff made a prima facie case of discrimination, the defendant introduced a non-discriminatory reason for the adverse job action, and the plaintiff introduced evidence of pretext sufficient to survive summary judgment. The cases thus turned on whether the plaintiff could introduce sufficient evidence that the true reason for the adverse job action was impermissible discrimination.

In *Brennan v. GTE Government Systems Corp.*, 150 F.3d 21 (1st Cir.1998) the Court of Appeals reversed the District Court's granting of defendant employer's motion for summary judgment.[8] Plaintiff introduced statistics as evidence of discriminatory animus: in the RIF affecting plaintiff, "younger engineers received preference in the distribution of new computers and new assignments, [and] a high proportion of older persons were discharged and ranked low in the rating and ranking ..." *Brennan*, 150 F.3d at 30. In addition, plaintiff introduced evidence that, when he approached his supervisor about the layoff, the supervisor said, "I was told it wouldn't matter to you guys." *Brennan*, 150 F.3d at 25. Plaintiff alleged that the supervisor meant "you guys" to mean older employees, and referred to early retirement benefits to which he mistakenly believed the older employees were entitled. *See id.*

In *Mulero–Rodriguez v. Ponte*, 98 F.3d 670 (1st Cir.1996), the Court of Appeals reversed summary judgment for the defendant. Plaintiff had alleged age and national origin discrimination. The national origin discrimination decision hinged on a comment, made by employee Caceiro, that plaintiff was the only Puerto Rican running a Cuban company. *See id.* at 675. The district court found that Caceiro was not in a position to influence decisions made about the plaintiff's job. The Court of Appeals disagreed, and held this comment sufficient evidence of national origin discrimination. As a result of this change, the Court of Appeals reversed the District Court's dismissal of the national origin discrimination claim. Plaintiff's age discrimination claim again came down to one remark, this time by Ponte, one of the owners. Eight months before plaintiff's discharge, Ponte said that plaintiff was "too old to handle" supervision of salespeople. *Id.* at 676. The District Court found this statement too remote from the actual termination. The Court of Appeals disagreed, finding a nexus between this remark and an employment act negative toward plaintiff—changing the company's bonus structure to one based on merit, not seniority. Again, as a result of this change, the Court of Appeals reversed the District Court's dismissal of the age discrimination claim.

In *Woodman v. Haemonetics Corp.*, 51 F.3d 1087 (1st Cir.1995), plaintiff sued under ADEA for wrongful termination. After receiving glowing performance reviews, plaintiff suddenly received a bad evaluation and

---

8. The District Court ruled that plaintiff failed to establish a prima facie case, *see id.* at 25, so the Court of Appeals considered for the first time the issues of pretext and discriminatory animus.

was soon terminated. On summary judgment, plaintiff introduced evidence that his supervisor, Mary LeBlanc, had said of upper management: "These damn people—they want younger people here." *Woodman*, 51 F.3d at 1090. The District Court held this remark inadmissible as multiple hearsay and, considering the record without it, granted defendant's motion for summary judgment. *See id.* at 1090. The Court of Appeals found that LeBlanc's statement was not hearsay and, considering the record including it, reversed the District Court decision. *See id.* at 1094. Allowing consideration of LeBlanc's statement was the only evidentiary change by the Court of Appeals.

In all of these cases, plaintiff alleged at least one piece of evidence that explicitly referred to plaintiff's membership in a protected class, and stated or implied that this membership was or would soon adversely affect plaintiff's employment prospects. By contrast, in cases where plaintiff fails to make any connection between adverse employment actions and membership in a protected class, summary judgment is granted to the employer, and the judgment is affirmed. *See, e.g., Hidalgo v. Overseas Condado Insurance Agencies, Inc.*, 120 F.3d 328 (1st Cir.1997), *Udo v. Tomes*, 54 F.3d 9 (1st Cir.1995).

Thomas does not produce this crucial evidence. She successfully alleges unfair treatment by her supervisors, principally Flannery. She produces evidence that may indicate racial animus among her co-workers, chiefly the "cleaning the floor" remark and the bracelet incident. She cannot, however, show a connection between the remarks by her co-workers and the actions of her supervisors. Assuming all facts for the plaintiff, she faced an unwelcoming office environment coupled with conspicuously unfair treatment by her immediate supervisor. We have found no cases in this circuit where evidence of unfair treatment alone, without any explicit evidence of discriminatory animus, allowed plaintiff to survive summary judgment.

 Plaintiff's own belief and contention that racial animus was the root of her employment troubles cannot suffice to carry her burden. "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990), citing *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir.1989); *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 109–10 (1st Cir.1985). While powerful evidence of flagrant pretext may, by itself, support a finding of discrimination, *see Hicks*, 509 U.S. at 507, 113 S.Ct. 2742, plaintiff has not produced such evidence.

 "Title VII does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision." *Smith v. Stratus Computer*, 40 F.3d 11, 17 (1st Cir.1994), citing *Mesnick*, 950 F.2d at 825. The facts in this case, read most favorably to plaintiff, do not support such a finding. The Court therefore grants defendant's motion for summary judgment.

SO ORDERED.