Myrtle THOMAS, Plaintiff, Appellant,

v.

EASTMAN KODAK COMPANY,
Defendant, Appellee.

No. 98–2231.

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1998.

Decided July 15, 1999.

Marisa A. Campagna, with whom the Law Offices of Marisa A. Campagna, Charles P. Wagner, and Silva & Wagner were on brief, for appellant.

Michael A. Fitzhugh, with whom Jon M. Nelson and Fitzhugh & Associates were on brief, for appellee.

Before Lynch, Circuit Judge, Bownes, Senior Circuit Judge, and Lipez, Circuit Judge.

LYNCH, Circuit Judge.

In 1993, Myrtle Thomas, the only black Customer Service Representative in Eastman Kodak's Wellesley, Massachusetts office, was laid off. Thomas responded with a race discrimination suit against Kodak under Title VII, 42 U.S.C. §§ 2000e to e-17, arguing that Kodak's layoff decision was discriminatory because it resulted from a ranking process that relied on racially biased performance appraisals prepared in 1990, 1991, and 1992. Kodak made two arguments in its motion for summary judgment: first, that Thomas's claim was time-barred because the performance appraisals were conducted outside of Title VII's statutory limitation period, and second, that Thomas failed in any event to present enough evidence of racial animus to support a disparate treatment claim. The district court disagreed with the first point but agreed with Kodak's second argument and granted summary judgment. Both issues are before us on appeal.

We hold that the date of the notice of the layoff is the date from which the limitations period ran. Because the evaluations caused no concrete harm until the layoff, we reject the employer's argument that, instead of the layoff date, the date of the evaluations should be used as the start of the limitations period. Because we also find that she has presented enough evidence to support her claim that the performance appraisals were racially biased, we reverse the district court's grant of summary judgment and remand for further proceedings.

After thirty-five years of litigation under Title VII, cases can still present new wrinkles. This is one such case. Because it raises a number of important issues—some new and some familiar but difficult—we preview the key holdings.

█ First, when an employee claims that a layoff is discriminatory and the employer utilizes scores from past performance appraisals in an objective formula to determine who will be laid off, the limitations period runs from the date of the notice of layoff where the laid off employee has suffered no concrete earlier harm from the appraisals.

Second, once there is sufficient evidence to create a material issue of fact that the employer's articulated reason for an adverse employment action is a pretext, there is no requirement that a plaintiff always produce direct evidence to demonstrate that the real reason was discriminatory.

Third, Title VII's prohibition against "disparate treatment because of race" extends both to employer acts based on conscious racial animus and to employer decisions that are based on stereotyped thinking or other forms of less conscious bias.

Fourth, under the *McDonnell Douglas /Burdine* framework, a court may not enter summary judgment for an employer based upon a non-discriminatory reason not articulated by the employer but identified sua sponte by the district court.

**I**

In reviewing a grant of summary judgment, we consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Aponte Matos v. Toledo Davila,* 135 F.3d 182, 186 (1st Cir.1998). Given the subtlety of the questions before

us, we outline Thomas's experiences at Kodak in some detail.

Thomas was a long-term Kodak employee. She first began working for the company in 1974. In 1980, after working for six years in clerical and administrative positions in Kodak's Rochester, New York facility, she was promoted to Customer Support Representative ("CSR") within the Office Imaging Division and transferred to Kodak's office in Wellesley, Massachusetts.

Along with five other CSRs working out of the Wellesley office, Thomas supported customers in an assigned territory who owned Kodak copiers and other Kodak equipment. She helped salespeople perform installations, trained customers in the use and maintenance of Kodak equipment, facilitated communication between customers and sales and service personnel, and provided other forms of marketing support.

Thomas generally performed her job well. Kodak managers who supervised Thomas during her first ten years as a CSR in the Wellesley office reported variously that they were never dissatisfied with her performance, that they were "delighted" with Thomas, that her work was "excellent" and "far superior" to that of some of the other CSRs, that she was "very much on top of things," and that she was "the perfect support person."

Co-workers and customers expressed similar sentiments. A sales representative who worked with Thomas sent a memorandum to Thomas's supervisor praising her "continuous professionalism," "very high level of commitment," and "total dedication." The sales representative later noted that he was particularly impressed with the way a certain customer "really went out of his way" to emphasize his satisfaction with Thomas's support. Another customer who contacted Kodak after Thomas's layoff described Thomas as "an irreplaceable part of the Kodak team" and explained that Thomas was the primary reason for his selection of Kodak copiers

over copiers from other companies. The customer concluded: "In my many contacts with company representatives, I have not met anyone of the class and caliber of Myrtle Thomas."

Because of her high level of performance, Thomas received awards and bonuses from Kodak. In 1989, the company also changed Thomas's grade from K4 to K6, which resulted in a salary increase. According to Kodak's job description, the K6 grade was limited to CSRs who were "making an outstanding contribution to the support activities," defined as "servicing the largest and/or most sensitive accounts, developing and giving individualized presentations and/or demonstrations, and training new CSRs." Thomas received at least eight other salary increases during her years as a CSR. At the time of the 1993 layoff, Thomas was the fourth most senior CSR in the Wellesley office and earned the third highest salary.

The Kodak compensation plan stated that "[t]he company's goal for [its] pay program is to reward each individual's job performance appropriately" and to ensure that "[p]eople with higher performance will, over time, be paid more than average performers." The company made use of annual performance appraisals in order to reach this goal. According to the compensation plan, performance appraisals were also used for a number of other purposes, including:

A. Evaluating and documenting the performance of each individual in comparison with performance expectations for the job.

B. Providing individuals with constructive feedback.

C. Identifying the guidance and training that can help individuals be as successful as their ability permits.

[and]

D. Determining who should be promoted, transferred, demoted, terminated, laid off, and re-employed.

To conduct an appraisal, the supervisor who directed an employee's day-to-day activities filled out an appraisal form. The form contained a section pertaining to "basic performance measures," which included categories for quality of results, quantity of results, job skills, and teamwork. Another section pertained to "additional performance measures," including dependability, versatility, communications, and leadership. The form required the supervisor to give the employee a rating from 1 to 7 for each applicable category, as well as an overall rating.[1] A separate section of the appraisal form contained space for the supervisor's comments on the evaluated categories, a description of any developmental opportunities, a description of matters discussed during the post-appraisal interview with the employee, and both supervisor and employee signatures. Each appraisal was also reviewed and signed by the appraiser's supervisor. The appraiser and the appraiser's supervisor were together responsible for the appraisal's accuracy, consistency, and conformance to company policy, including a policy favoring fair and objective evaluations, conducted "without regard to non-job-related criteria such as[ ] race."

Kodak intended the appraisal scores to be on a curve, company-wide. The compensation plan suggested that "performance appraisal ratings for large groups of people (approximately 100 or more) [should] average around the middle of the rating scale," but acknowledged that factors such as the amount of turnover and the percentage of long-term employees could influence the distribution of ratings in any given group, particularly groups with a small number of employees. The compensation plan suggested that appraisers attempt to validate their distribution of appraisal ratings by rank-ordering employees in the same grade and job category. After the rank ordering was complete, supervisors would finalize the preliminary ratings to agree with the rank-order results. However, these rank orderings were not discussed with employees. Supervisors were told that "[a]ppraisals verified through this process [should be] communicated by referencing performance relative to job expectations with no reference to the rank-order process."

Thomas's appraisals for 1988 and 1989 show that she was performing at a high level. In 1988, when she was responsible for more than 400 machines, Thomas received seven 5 ratings and one 6 rating, for an overall rating of 5, which was a rating "appropriate for individuals who not only achieve results and meet all expectations on a regular basis, but who go beyond these requirements from time to time." Her supervisor's comments were uniformly positive. In 1989, when she was responsible for more than 500 machines, Thomas received even higher ratings—five 6s and three 5s, for an overall rating of 6, which meant that her "[p]erformance consistently exceed[ed] the requirements of the position and [was] characterized by unusual initiative, resourcefulness, and creativity." Once again, the supervisor's comments were uniformly positive.

In 1989, Kodak created the position of Customer Support Manager throughout its Office Imaging organization. Thomas asked to be considered for the Wellesley position, but was told that she was not qualified. Instead, the position went to Claire Flannery, a former CSR who had been working as a division secretary. As Customer Support Manager, Flannery was responsible for supervising the six Wellesley CSRs. She remained in this position until 1993, when both she and Thomas

---

1. The lowest rating was 1 (for performance that "does not meet essential job requirements") and the highest was 7 (for performance that "far exceeds requirements of the position"). The middle rating of 4 was considered appropriate "for individuals who regularly perform all assigned responsibilities with independence and initiative, and achieve expected results on a continual basis."

were laid off as part of a company-wide reduction in force.

The appointment of Flannery as Customer Support Manager marked a significant downturn in Thomas's fortunes at Kodak. Although Thomas states that she and Flannery "were on a professional basis," and Flannery denies having any problems· with Thomas's job performance, it appears that their working relationship was strained. Thomas alleges that Flannery treated her differently from the other five CSRs, all of whom were white[2] (as were, in fact, all of the other CSRs during Thomas's thirteen years in the Wellesley office).

She describes a number of occasions on which she claims Flannery unnecessarily damaged her professional standing with customers. For example, on the only occasion on which Flannery accompanied Thomas to a customer training session in order to observe Thomas's work, Flannery instead took over the session and conducted the entire training herself. On another occasion, Flannery told Thomas the wrong time for a training session Flannery had scheduled on site, and then refused to write to the customer, who was upset, to explain why Thomas had been several hours late. (After Thomas proved to Flannery what had occurred by playing back Flannery's voice mail message to her, Flannery did agree to call—but not to write—the customer.) On a third occasion, Flannery became quite angry and attempted physically to block Thomas from leaving a CSR meeting which had been scheduled at the same time as an important training session for one of Thomas's customers.

Thomas also provides evidence from which the inference can be drawn that Flannery did not evaluate her skills fairly or give her appropriate opportunities for growth and success. For example, Flannery did not travel with Thomas as she did with the other CSRs in order to observe Thomas's interactions with customers.

Flannery did not give Thomas the same type of developmental opportunities available to other CSRs. She criticized Thomas for lack of computer skills, but then failed to train Thomas when computer equipment became available. After Thomas was asked to prepare a presentation for a Kodak meeting, Flannery told her that there would not be time for her presentation, although time was found for a presentation by a white employee on a less pressing topic. Thomas was denied the opportunity to apply for sales jobs, despite her good track record in sales support activities. Flannery expressly discouraged her from applying for a management position in another division, telling her she was not qualified because she did not yet have a master's degree (Thomas was studying for one at the time), even though none of the other managers in that position had a master's degree or even a bachelor's degree. Finally, Flannery went to great lengths to prevent Thomas from meeting with Bill Cassidy, the Regional Vice President for Office Imaging, to discuss advancement opportunities, and became angry when Thomas nevertheless managed to schedule an appointment.

Thomas's most significant and concrete allegation is that Flannery gave her inaccurately low scores on her annual performance appraisals. For example, after receiving only 5s and 6s in 1988 and 1989, Thomas received a 2, four 3s, and a 4 from Flannery in 1990, for an overall score of 3. This was a below-average rating, appropriate for employees who had "a need for further improvement to achieve a middle rating [of 4]" or for employees "whose overall performance has slipped from a higher level." Thomas's performance appraisal scores in 1991 and 1992, while higher than her 1990 scores, were also inappropriately low, in Thomas's estimation—especially when compared to the higher scores that Flannery gave to other

2. We use the terms "black" and "white," as Thomas has chosen this terminology.

CSRs. Thomas presents specific comparisons, discussed further below.

Thomas was distressed by the 1990 performance appraisal and refused to sign it. She also refused to sign the 1992 appraisal, and signed her 1991 appraisal only " 'out of a joke,' because it was a joke." It is clear that Thomas disagreed with Flannery's evaluations; more than that—she found them "insulting" and "shameful." To the extent that it was possible for her to compare salary and raises with other CSRs, however, she would not have noted any obvious effects of the negative appraisals, since neither her salary nor the raises she was given during Flannery's tenure as Customer Support Manager differed significantly from those of other employees. She did complain about the appraisals, both to Flannery herself and to others within Kodak, including Bill Cassidy, the Regional Vice President for Office Imaging, and Patti Weissinger, a Human Resources Representative. However, fearing retaliation from her new boss, she did not file a formal charge against Flannery with the Human Resources Department, and Kodak did not take any action in response to her informal complaints.

In January 1993, Kodak decided to reduce the number of employees in its Office Imaging Division. It selected employees for layoff using a "Performance Appraisal Ranking Process" ("PAR process"), which produced a numerical score for each employee by adding together the employee's overall performance appraisal score for each of the three preceding years, after weighting the most recent score by a factor of 25 and the second most recent score by a factor of 5.[3] Thomas's PAR ranking, which was derived from the three appraisals conducted by Flannery, was the second lowest of the Wellesley CSRs. Since Kodak had decided to cut two Wellesley CSR positions, as well as the Customer Support Manager position, Flannery, Thomas, and the lowest ranked CSR (Eileen Lavallee) were laid off in March 1993.

## II

In July 1993, four months after her layoff, Thomas filed a charge of race discrimination with the Equal Employment Opportunity Commission. The EEOC issued a "right to sue" letter in February 1996, and Thomas brought suit in May 1996.

Although her complaint asserts a variety of race discrimination claims, Thomas has focused primarily on Kodak's 1993 decision to terminate her, arguing that this decision was discriminatory because it was based on discriminatory performance appraisals conducted by Flannery from 1990 through 1992.[4] It is the layoff which is the subject

3. This formula was used for employees whose grade remained the same for all three years. If an employee had changed grades during the three year period, the formula gave less weight to the score immediately following the grade change.

4. Thomas described a number of other events as evidence of unlawful race discrimination by Kodak. The district court provided a succinct summary:

When plaintiff was transferred to Wellesley, Kodak did not fly her to Massachusetts, as it had other transferred employees. Instead, Thomas was told to drive a car that had been requested by Richard Austin, her new supervisor. The car was in disrepair, requiring a new muffler. Though other employees had two weeks in a new location before reporting to work, plaintiff was told to report right away.

As part of plaintiff's move benefits, Kodak provided storage for her belongings. The warehouse burned in 1981, destroying virtually all of Thomas' belongings. Thomas gave Austin an inventory of her losses; in response, he asked, "Are you rich or something?" Before Thomas was reimbursed, another Kodak employee encouraged her to change her inventory listing. Defendant did not reimburse Thomas for five years.

A few months after Thomas began working in Wellesley, she was standing with a group of employees when Austin introduced two visiting sales managers. Austin introduced everyone in the group except Thomas.

In 1983, Thomas passed a co-worker in the hallway outside the department manager's office. The co-worker asked the manager if plaintiff was "here to do the cleaning."

of this appeal. Kodak moved for summary judgment, contending that Thomas's claim was time-barred, and in the alternative, that she had failed to present enough evidence of racial animus to reach a jury under the First Circuit's standard for showing disparate treatment once pretext has been shown. *See Udo v. Tomes,* 54 F.3d 9, 12–13 (1st Cir.1995) (describing standard). The district court found Thomas's claim timely, but granted summary judgment to Kodak on the merits argument. *See Thomas v. Kodak,* 18 F.Supp.2d 129, 133–38 (D.Mass.1998). On appeal, Thomas argues that the district court applied the standard incorrectly. Kodak defends the district court's application of the standard, while also continuing to argue that Thomas's claim is time-barred.

### III

We review the district court's grant of summary judgment de novo, *see Lennon v. Rubin,* 166 F.3d 6, 8 (1999), and will find summary judgment appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed. R.Civ.P. 56(c).

> Thomas lost a gold bracelet at work. A co-worker announced finding it just before a sales meeting, as other employees arrived. Thomas claimed the bracelet, and described it at his request. He refused to return the bracelet until he had confirmed that it did not belong to another, white female employee.
> *Thomas v. Eastman Kodak Co.,* 18 F.Supp.2d 129, 132 (D.Mass.1998).

5. The full story is more complicated, in part because § 2000e–5(e) interacts with § 2000e–5(c), which imposes a sixty-day waiting period between the filing of a charge with state or local authorities and the filing of a charge with the EEOC:

> [A] complainant in a deferral State ... need only file his charge within 240 days of

### A

We first address Kodak's argument that the district court erred in not dismissing the action as untimely. Title VII requires aggrieved individuals to file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). In a "deferral jurisdiction," such as Massachusetts, this period is extended to three hundred days.[5] *See* 42 U.S.C. § 2000e–5(e)(1); *Mohasco Corp. v. Silver,* 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980); *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181–82 (1st Cir.1989). This relatively short limitations period serves important interests. "The limitations period[ ], while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect[s] employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College v. Ricks,* 449 U.S. 250, 256–57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In the Title VII context, as in others, "the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Id.* at 259–60, 101 S.Ct. 498 (internal quotation marks omitted) (quoting *Johnson v. Railway Express Agency, Inc.,* 421 U.S.

> the alleged discriminatory employment practice in order to insure that his federal rights will be preserved. If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII will nonetheless be preserved if the State happens to complete its consideration of the charge prior to the 300-day period.
> *Mohasco Corp. v. Silver,* 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). None of these subtleties is relevant to the question here, since, as the district court noted, "[p]laintiff filed her EEOC charge within the minimum 180 days of her termination, but more than the maximum 300 days after her most recent evaluation." *Thomas,* 18 F.Supp.2d at 133 n. 1.

454, 463–64, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). Congress has made that value judgment.

■ However, Title VII's statute of limitations is not self-executing. The three hundred day (or one hundred and eighty day) rule cannot be mechanically applied, because it is not possible to pinpoint when the limitations period begins—i.e., when the plaintiff's claim "accrues"—without first determining the date, or the temporal boundary, of the "alleged unlawful employment practice" referred to in § 2000e–5(e)(1).

The crux of Thomas's claim is that her layoff is tainted because the 1990–92 performance appraisals were tainted by Flannery's alleged racial bias. Thomas does not argue that Kodak's decision to utilize the PAR process to determine who would be laid off was racially biased. *See Thomas*, 18 F.Supp.2d at 135 ("[P]laintiff does not contend that Kodak's ... PAR layoff process[ ] [was itself] discriminatory."). As we understand her argument, she does not allege that Flannery and other Kodak employees participated in a conspiracy to oust her from her job because of her race, using the performance appraisals and the PAR process as a thin cover for this express discriminatory purpose. Rather, she argues that the PAR process was illegitimate under Title VII in a derivative way, because its calculations were based on discriminatory appraisal scores. If racially biased scores were plugged in to the PAR formula, she argues, then the ranking that came out must also be biased.

According to Kodak, this argument can only mean that the performance appraisals themselves constitute the "unlawful employment practice" at issue under § 2000e–5(e)(1), and thus that any claim regarding the allegedly biased performance appraisals must have accrued at the time the appraisals were conducted. Since even the most recent appraisal (presented to Thomas in May 1992) was conducted more than three hundred days before Thomas filed her complaint with the EEOC in July 1993, Kodak asserts that Thomas is precluded from questioning the racial neutrality of any of the three performance appraisals. And without the ability to challenge the appraisals upon which the PAR process was based, Kodak notes, Thomas's discriminatory termination claim collapses.

According to Thomas, the fact that the performance appraisals were conducted more than three hundred days before she filed her EEOC charge is irrelevant, because the adverse employment decision that she is challenging—the "unlawful employment practice" under § 2000e–5(e)(1)—is Kodak's decision to lay her off, and not the performance appraisals independently, and this decision indisputably fell within the statutory period.

Kodak's general policy stance makes sense: given that the central purpose of the statute of limitations is to protect employers from stale claims, it cannot be true that plaintiffs have an unfettered ability to reach back and litigate biased evaluations. Yet Thomas's position is also reasonable, since it seems unlikely that Title VII permits employers to take a new employment action such as a layoff which first causes an employee harm, as long as the allegedly discriminatory evaluations on which the layoff is based were conducted more than three hundred days earlier.

■ Counsel did not call the court's attention to any First Circuit caselaw on this point. The district court, led to believe that the First Circuit had not addressed this question, "look[ed] for guidance elsewhere." *Thomas*, 18 F.Supp.2d at 133. The court focused on the decision of the Third Circuit in *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407 (3d Cir.), *cert. denied*, 502 U.S. 941, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991). The facts in *Colgan* do closely resemble the facts here. Like Thomas, the *Colgan* plaintiff was fired after receiving a negative performance review. *See id.* at 1410–11. He filed a charge of age discrimination with the EEOC within three hundred days of his termination, but more than three hundred days after the negative performance re-

view. *See id.* at 1411. The Third Circuit determined that Colgan's claim was not time-barred because it accrued at Colgan's termination, not when he received the negative review. *See id.* at 1415–21. The court concluded that "an alleged unlawful employment practice, here the performance evaluation, must have inflicted harm which was or should have been noticed, or it will not have triggered the limitations period." *Id.* at 1418. Colgan's review stated that he failed to meet job requirements and expressly warned that action would be taken unless his performance improved. *See id.* at 1410. Nonetheless, the court found that the review did not produce the requisite notice of harm to trigger the running of the statute of limitations, because "[t]he performance evaluation had no immediate consequence on Colgan's employment, such as a loss of seniority, nor did it alert Colgan to the possibility that consequences would flow from it without an opportunity for him to improve his performance." *Id.* at 1419–20. The Third Circuit based its *Colgan* analysis on a trilogy of Supreme Court cases, which we summarize briefly here. In *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the Supreme Court held that a flight attendant who was wrongfully forced to resign and then later rehired could not challenge the airline's refusal to grant her seniority as if there had been no break in her employment, since the relevant wrongful act—Evans's being forced to resign—occurred outside of the limitations period. *See id.* at 555, 97 S.Ct. 1885. In *Ricks*, the Court held that the college's denial of tenure, not a later discharge pursuant to that denial, was the event that triggered Title VII's statute of limitations. *See Ricks*, 449 U.S. at 256–58, 101 S.Ct. 498. Finally, in

*Lorance v. AT & T Technologies*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), the Court held that the Title VII limitations period begins to run when an employer adopts a seniority system, not when an employee is demoted pursuant to that system.[6] *See id.* at 912–13. Read together, this trilogy defines a notice rule: an employer action only triggers the running of the statute of limitations if that action has concrete, negative consequences for an employee, and the employee is aware or should have been aware of those consequences. *See Colgan*, 935 F.2d at 1415–21; *see also* 2 B. Lindemann & P. Grossman, *Employment Discrimination Law* 1349 (3d ed.1996) (observing that Supreme Court cases "seem to establish a relatively simple 'notice' rule as to when discrimination 'occurs' ").

■ We think many aspects of *Colgan*'s reasoning are correct. However, we find more direct guidance in a First Circuit case decided several years before *Colgan*. In *Johnson v. General Electric*, 840 F.2d 132 (1st Cir.1988), a black employee claimed that he had been denied a promotion based on a special review process that was intentionally designed to prevent him from qualifying for promotion. *See id.* at 134. The employer contended that the plaintiff's claim accrued when the review process was first put into place, while the plaintiff insisted that the clock did not start running on his claim until he was informed that he had failed the review process and would not be promoted. *See id.* The district court, relying on *Ricks*, held that the establishment of the review process was the "unlawful employment practice" of which the plaintiff complained, and therefore started the running of the statute from that point. *See id.* Although

---

6. Section 112 of the 1991 Civil Rights Act later overruled *Lorance,* allowing employees to challenge a seniority system "when the system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system." 1991 Civil Rights Act, Pub.L. No. 102–166, § 112,

105 Stat. 1071, 1079 (1991) (codified at 42 U.S.C. § 2000e–5(e)(2)). This may mean that seniority systems should be treated as an exception to the "notice rule" discussed in *Colgan;* alternatively, it may simply mean that Congress thought that the Court had misapplied the notice rule in the seniority system context.

this court affirmed the dismissal on other grounds, it disagreed with the district court's analysis, noting that the "question [is] ... whether a claim accrues when an employee is made subject to an ... evaluation ..., or when that ... evaluation is applied to deny the plaintiff particular benefits or positions." *Id.* This court chose the latter rule, holding that the notice standard is met and the statute of limitations is triggered only if "the implications [of the evaluation] have crystallized" and "some tangible effects of the discrimination were apparent to the plaintiff," i.e., if "the plaintiff is aware that he will in fact be injured by the challenged practice."[7] *Id.* at 136–37.

The decision was motivated, in part, by concerns about ripeness. The court noted that "it is far from clear whether claims under Title VII and analogous statutes would be ripe for adjudication until discriminatory systems [or evaluations] were actually applied to plaintiffs in particular employment decisions," and observed that "[i]t is unwise to encourage lawsuits before the injuries resulting from the violations are delineated, or before it is even certain that injuries will occur at all." *Id.* at 136.

*Johnson*'s notice standard serves multiple functions. By starting the limitations

clock as soon as harm is noticed, or should be noticed, the standard protects employers from stale claims while also lessening the risk that employees will bring unripe claims. The notice standard protects employees as well, because it ensures that claims will not be foreclosed by events that ocurred outside the limitations period that did not put the employees on notice.

 The notice standard in *Johnson* also resolves the apparent contradiction between the two reasonable policy stances pressed by the litigants here. Thomas is correct that Title VII extends to a neutral employer decision-making process that relies on discriminatory evaluations. But Kodak is' also right that employees do not have an unfettered right to reach back to challenge previous evaluations. The key is whether those evaluations had tangible, concrete effects at the time they were conducted. If the evaluation did cause tangible, concrete harm, the notice standard requires the injured employee to promptly bring suit to recover for those harms. Failure to do so will render any later claim regarding those particular harms time-barred.[8]

This means that an employer could be exposed to Title VII liability for harms stemming from discriminatory evaluations

---

7. *Johnson,* which was decided shortly before the Supreme Court's decision in *Lorance,* suggested that this rule would apply to discriminatory seniority systems as well. *See Johnson,* 840 F.2d at 134. Congress has since provided a specific accrual rule for seniority systems. *See* 1991 Civil Rights Act § 112 (codified at 42 U.S.C. § 2000e–5(e)(2)).

8. If, for example, a poor job evaluation resulted in a denial of a salary increase, notice of the denial would mark the accrual point for a pay inequity claim. Under *Ricks,* the statute would also begin to run on any other harm that was the "delayed, but inevitable, consequence" of the denial of a salary increase, *Ricks,* 449 U.S. at 257–58, 101 S.Ct. 498, since "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at

which the consequences of the acts became most painful," *Ricks,* 449 U.S. at 258, 101 S.Ct. 498 (internal quotation marks and emphasis omitted) (alteration in original) (quoting *Abramson v. University of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979)). *Ricks* did not address the question whether the statute of limitations would also begin to run on an unrelated harm (unrelated, that is, to the denial of a salary increase) which might later arise from the challenged employer act—for example, whether a plaintiff's challenge to a layoff decision based on the poor evaluation could be time-barred because the evaluation initially resulted in the denial of a pay increase. As we explain below, the facts here do not require us to resolve this difficult question.

some years after the evaluations were conducted, if the evaluations first cause tangible harm to the employee at that later point. Kodak argues that this puts employers in an untenable position. We disagree, for three reasons.

First, as a matter of practicality, employers are unlikely to rely on "stale" evaluations. The older the evaluation, the less likely an employer would be to use that evaluation. as the basis of an employment decision. Employers' preference for more recent evaluations is demonstrated dramatically by Kodak's own PAR formula, which used only the latest three evaluations and then weighted the most recent by a factor of 25.

Second, the passage of time would affect employees as well as employers. An employee who sought to challenge an old evaluation would bear the burden of proving that the evaluation was discriminatory—and the older the evaluation, the more difficult that task would be.

Third, the standard gives concomitant advantages to employers. It avoids forcing employees to "run to the EEOC" each time they disagree with a performance evaluation. As the district court aptly observed:

> If we apply the time bar to plaintiff's [performance appraisals], then we require a given plaintiff to file EEOC charges successively for each performance evaluation, informal feedback from a supervisor, or office rumor, so long as these events—even if nonharmful in themselves—might be informed by racial animus and could someday contribute to a later, harmful result. This requirement would surely disrupt the American workplace....

*Thomas*, 18 F.Supp.2d at 134–35. Instead, the *Johnson* notice standard allows employees to give employers the benefit of the doubt, where employees suspect that an evaluation which has yet to cause tangible harm might be tainted by bias, and encourages them to try to solve the problem by proving their actual worth to the employer. And while the standard places an ongoing obligation on employers to monitor their evaluation processes to ensure that they are free from illegal bias, employers also benefit from the opportunity to base personnel decisions on accurate, bias-free evaluations. In any event, this sort of obligation is foreseen by Title VII, since the statute encourages the elimination of both obvious and subtle forms of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In arguing against the application of the *Colgan* rule (which, as explained above, resembles the First Circuit standard announced in *Johnson* ), Kodak has presented a two-stranded argument. The first strand is based on notions of fair notice to the employer. The second asserts that Thomas's timeliness argument relies on an impermissible combination of the equitable tolling and continuing violation doctrines.

Kodak would substitute for the accrual rule in *Johnson* a rule that focuses on notice to the employer. According to Kodak, the *Colgan* accrual rule makes "bad law because it allows an employee to introduce a time-barred incident where the employee has never previously contended, even in an informal process afforded by the employer, that the employee was subjected to unlawful discrimination." Appellee's Brief at 17. According to Kodak, this violates "the policy underlying Title VII [entitling] an employer ... to some kind of prior notice." *Id.*

This is not an irrational position, but Kodak cites no authority for it. The argument calls to mind the exhaustion rule imposed by courts in the ERISA context, *see* Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq., which requires employees to take full advantage of employer-internal appeals processes before bringing suit to recover denied benefits, *see McMahon v. Digital Equipment Corp.*, 162 F.3d 28, 40 (1st Cir.1998) (noting court-imposed exhaustion rule for

ERISA benefit claims). But the analogy is inappropriate. ERISA requires employers to offer employees a speedy appeals procedure for denied benefits. *See* 29 U.S.C. § 1133 (stating that employers must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim"); 29 C.F.R. § 2560.503–1 (imposing time limits). Only after this process is complete does the ERISA statute of limitations begin to run. *See, e.g., Godfrey v. BellSouth Telecomms., Inc.,* 89 F.3d 755, 759–60 (11th Cir.1996); *Martin v. Construction Laborer's Pension Trust,* 947 F.2d 1381, 1385 (9th Cir.1991).

■ In Title VII, by contrast, Congress chose not to impose a particular employer-internal appeals procedure. Furthermore, the statute of limitations for a Title VII claim is not tolled while an employee exhausts any internal remedy the employer has made available. *See Ricks,* 449 U.S. at 261, 101 S.Ct. 498 ("[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods."); *International Union of Elec. Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 236–37, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976) (holding that the Title VII statute of limitations is not tolled by a collective-bargaining grievance procedure). Thus, a court-imposed exhaustion requirement would not work well in the Title VII context, because it would place employees in the position of having to exhaust an internal appeals process of uncertain length while also bringing suit within three hundred (or one hundred and eighty) days of the employer's allegedly wrongful act.

Kodak's position bears an even closer resemblance to one aspect of the approach first explicated in *Stoller v. Marsh,* 682 F.2d 971 (D.C.Cir.1982), and followed by a number of other courts, *see, e.g., Hale v. Marsh,* 808 F.2d 616, 620 (7th Cir.1986); *Brown v. City of New York,* 869 F.Supp.

158, 169 (S.D.N.Y.1994); *Woolery v. Brady,* 741 F.Supp. 667, 669–70 (E.D.Mich. 1990). The *Stoller* court held that a plaintiff could challenge an employer's wrongful reliance on discriminatory evaluations, even where the plaintiff has acknowledged that the employer's reliance itself was not intentionally discriminatory. *See Stoller,* 682 F.2d at 979 ("Otherwise an organization could separate illegal motive from decisionmaking responsibility, contrary to the principle that Title VII applies to the employer as an organization."). This is essentially the same result that *Johnson* permits. *See Johnson,* 840 F.2d at 135, 137 (citing this portion of *Stoller* ).

But the *Stoller* court added a second part to this rule:

[A]fter preparation of employee evaluations, the employing organization may protect itself from Title VII liability by establishing procedures to allow employees to screen their personnel files and to remove damaging, discriminatory information.... If established procedures have given an employee a reasonable opportunity to inspect the supervisory evaluations in his or her file, to challenge allegedly inaccurate materials, and to have such materials corrected or removed, and if the organization gives its employees adequate notice that these rights may be exercised, then it may rely in good faith on such evaluations in making subsequent employment decisions without violating Title VII.

*Stoller,* 682 F.2d at 979 (footnotes omitted). Kodak's "notice to the employer" argument could refer to this second half of the *Stoller* rule: Kodak apparently wants to be able to rely on Thomas's performance appraisals, because in its view Thomas had a reasonable opportunity to inspect the appraisals and to challenge inaccuracies through the "Open Door" appeals process.

We can imagine advantages of the *Stoller* rule for both employers and employees. Employers, of course, would be able to limit their liability. Employees could con-

ceivably benefit as well, if the rule increased the likelihood that employers would implement effective review procedures. But we decline to adopt this rule—which was, in any event, implicitly rejected in *Johnson*—because we think any possible advantages would be outweighed by two serious risks. One is the obvious risk that employers would have carte blanche to rely on discriminatory appraisals as long as they offered their employees an "Open Door." Avoiding the first risk would entail a second: courts would need to interpret strictly the concept of "[adequate] procedures to allow employees to screen their personnel files and remove damaging, discriminatory information." This would in turn entail a degree of judicial scrutiny and interference with day-to-day employer operations that employers would be unlikely to welcome and which courts interpreting Title VII have tried to avoid. *See Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328, 337 (1st Cir. 1997) (noting courts' reluctance to " 'sit as super personnel departments' " (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991))).

The second strand of Kodak's timeliness argument is the claim that both Thomas and the district court have relied on an illegitimate "hybrid" of the equitable tolling and continuing violation doctrines. Thomas disavows any such reliance. We make several observations in response to Kodak's argument.

■ First, the First Circuit doctrine of equitable tolling is simply inapplicable to these facts. Some courts permit tolling of the statute of limitations if the plaintiff knew of a harm but not of its discriminatory basis. *See* 2 Lindemann & Grossman, *supra*, at 1350. But our approach to equitable tolling is narrower; First Circuit law permits equitable tolling only where the employer has actively misled the employee. *See Mack*, 871 F.2d at 185 (noting that the First Circuit's "narrow view" of equitable tolling reaches only "active deception" (internal quotation marks and ci-

tations omitted)); *Jensen v. Frank*, 912 F.2d 517, 521 (1st Cir.1990). There is no allegation here that Kodak actively attempted to mislead Thomas about her performance appraisals.

Second, there is no need to apply the continuing violation doctrine. Commentators have labeled this doctrine "the most muddled area in all of employment discrimination law," 2 Lindemann & Grossman, *supra*, at 1351, and some courts have gone so far as to conclude that the entire doctrine is misguided and unnecessary, *see, e.g., Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 282 (7th Cir.1993). We need not enter into that debate here. We describe the First Circuit's continuing violation doctrine with only as much detail as is necessary to show that it is inapplicable to Thomas's claim.

■ The First Circuit has recognized two different types of continuing violations: systemic violations, which "ha[ve] [their] roots in a discriminatory policy or practice . . . [that] itself continues into the limitation period," *DeNovellis v. Shalala*, 124 F.3d 298, 307 (1st Cir.1997) (quoting *Jensen*, 912 F.2d at 523), and serial violations, which are "composed of a number of discriminatory acts emanating from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII," *id.; see also Mack*, 871 F.2d at 182–84. The systemic violation doctrine is clearly inapposite because Thomas has not alleged that Kodak has "an overarching policy or practice" of conducting discriminatory evaluations. *Jensen*, 912 F.2d at 523. Kodak apparently believes that Thomas is inappropriately attempting to shoe-horn her claim into the serial violation category. This is not so. Whether a serial violation exists does depend in part on a type of notice standard similar to the one in *Johnson. See Sabree v. United Bhd. of Carpenters, Local No. 33*, 921 F.2d 396, 402 (1st Cir.1990) (stating that if an earlier event had " 'the degree of permanence which should trigger an employee's awareness and duty to as-

sert his or her rights,'" then it is not substantially related to the later event, and therefore cannot form part of a continuing violation (quoting *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983))). This similarity may be the source of Kodak's argument. But the serial violation doctrine, like the systemic violation doctrine, stands as an exception to the accrual rule recognized in *Johnson*. The purpose of this exception is to permit suit on later wrongs where a wrongdoer would otherwise be able to repeat a wrongful act indefinitely merely because the first instance of wrongdoing was not timely challenged. *See* D. Laycock, *Continuing Violations, Disparate Impact in Compensation, and Other Title VII Issues*, 49 Law & Contemp. Probs. 53, 55 (1986) (comparing the application of the continuing violation doctrine in employment discrimination cases to its application in an antitrust case, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and observing that "[o]bviously, United should not be able to continue its illegal conduct forever because no one challenged it during World War I"); J. MacAyeal, *The Discovery Rule and the Continuing Violation Doctrine as Exceptions to the Statute of Limitations for Civil Environmental Penalty Claims*, 15 Va. Envtl. L.J. 589, 615–22 (1996) (describing the history and purpose of the continuing violation doctrine); *see also Sabree*, 921 F.2d at 401 (discussing proper remedy).

In the Title VII context, the continuing violation doctrine applies where "a number of discriminatory acts emanat[e] from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII." *Jensen*, 912 F.2d at 522. Sexual harassment, failure to promote, and pay inequity cases often fall into this category. Plaintiffs in these cases experience harm from each employer act (e.g., a harassing comment, a denied pro-

motion, or a smaller paycheck), for which they could recover under Title VII. Thus, under the *Johnson* standard, each act could trigger the running of the statute of limitations. The continuing violation doctrine ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory.

Thomas's claim presents a different question: not whether she is permitted to bring suit after many repeated harms, but rather whether harm cognizable under Title VII existed at the time she first received her performance appraisals sufficient to mean that the notice of layoff is not the date on which the limitations period began for her layoff claim. This question is more appropriately addressed under the *Johnson* notice standard.

■ We consider whether the date on which the limitations period begins to run should be earlier than the notice of layoff because there was earlier concrete harm to Thomas resulting from the performance appraisals. According to Kodak's compensation plan, appraisal scores were intended to affect salary levels and determine "who should be promoted, transferred, demoted, terminated, laid off, and re-employed." It is not clear whether Kodak informed employees of this intention. But even if employees were familiar with the intended possible uses of the scores, it appears that the effects listed in the compensation plan remained abstract—mere possibilities, not certainties.

■ This was particularly true in Thomas's case. Flannery's appraisals evaluated Thomas's performance as only average or below average. But the appraisals did not specify that Thomas was to suffer an immediate consequence for her alleged performance failures,[9] much

---

9. Under *Ricks*, we must also consider whether the appraisals led to any other concrete harm for which the layoffs were the "delayed, but inevitable, consequence." *Ricks*, 449 U.S. at 257–58, 101 S.Ct. 498. We do not find any evidence of such related harm in the record.

less that they would mechanically lead to her being laid off. Because Thomas seeks to recover for an allegedly discriminatory layoff, we consider whether that particular consequence was apparent at the time Thomas received the appraisals. *Cf. Colgan*, 935 F.2d at 1410, 1419–20 (finding notice lacking even where an evaluation explicitly warned that adverse actions would be taken if the employee's performance did not improve). She was not told that layoffs were impending and that her scores placed her at high risk for layoff.[10] Even if she did have this information, it would fall short of the "crystallized" implications required under *Johnson*, 840 F.2d at 136, since being at risk for layoff (due to a low ranking relative to other employees) and actually being selected for layoff are two quite different things.

Kodak emphasizes the fact that Thomas refused to sign two of the three performance appraisals. According to Kodak, her refusal to sign "demonstrates that she was dissatisfied with [the appraisals] for some reason" and makes it "evident that she then believed she had been treated unfairly." Appellee's Brief at 18 n. 6. A trier of fact could, but need not necessarily, conclude that Thomas had notice of the appraisals' possible racial bias as soon as they were presented to her. However, this fact does not go to the relevant question under *Johnson*'s notice rule: whether Thomas had notice of immediate, tangible consequences of her poor scores. Kodak's argument pertains to notice of bias rather than the notice of harm required under *Johnson*. But notice of bias alone, absent harm, is clearly not sufficient under *Johnson*.[11]

We hold that the performance appraisals Thomas received in 1990, 1991, and 1992 did not trigger the statute of limitations in § 2000e–5(e)(1) at the time they were presented to Thomas, because they did not initially have any crystallized implications or apparent tangible effects. The notice of the layoff is the date on which the limitations period began to run because Thomas's low appraisal scores first resulted in concrete injury in 1993 when they led to her layoff. Since Thomas filed a charge with the EEOC within one hundred and eighty days of her layoff (the shortest possible period imposed under § 2000e–5(e)(1)), her claim is timely.

As noted above, it is not clear whether a separate, unrelated harm would also trigger the accrual of Thomas's layoff claim. We need not reach this question. Assuming arguendo that unrelated harms would trigger accrual of Thomas's layoff claim, accrual was not triggered here, because Thomas's appraisals did not in fact result in any tangible, concrete harms at the time they were presented to her. Although Thomas was denied some promotion opportunities during Flannery's tenure, she was not told that she lost those opportunities because of her low performance appraisals; rather, Flannery told her she lacked the proper credentials. Thomas was also not told that her salary would be affected by her low scores, and indeed, it appears that her salary kept pace with the other five CSRs throughout Flannery's tenure as Customer Support Manager.

10. The compensation plan instructed appraisers not to discuss appraisals in comparative terms, and appraisal scores were not openly discussed among employees. Thus, Thomas had no way to discover this information on her own. Although she knew that her scores were low in comparison to the scores she had received before Flannery became her supervisor, she could not know that they were low in comparison to the scores of other CSRs whom Flannery was evaluating.

11. Our analysis of the notice-of-harm issue might be different in the context of a hostile environment claim. In that context, we might find that Thomas's low appraisal scores caused some tangible harm as soon as they were presented to her, since Thomas reportedly found the low scores to be "insulting" and "shameful" (and demonstrated this by refusing to sign them). But pinpointing the moment of accrual for a hostile environment claim is a different problem altogether than the one here, since a certain accumulation of discriminatory events or situations is necessary before an employee is expected—or permitted—to bring a hostile environment suit. *See Provencher v. CVS Pharmacy*, 145 F.3d 5, 14–15 (1st Cir.1998) (noting that in some circumstances a plaintiff may be "unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern" (internal quotation marks omitted)).

## B

The second question on appeal is whether a reasonable jury could find, based on Thomas's evidence, that Flannery discriminated against Thomas because of her race when she assigned Thomas's performance appraisal scores. *See* 42 U.S.C. § 2000e–2(a)(1). To reach an answer, we follow the three stages of the "familiar burden-shifting framework," *Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 673 (1st Cir.1996), that was first outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further explained in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The three stages can be summarized as follows:

> First, the plaintiff[ ] must establish a prima facie case that [plaintiff] (1) was within a protected class; (2) met [the employer's] legitimate performance expectations; (3) was adversely affected; and (4) was replaced by another with similar skills and qualifications. Once [plaintiff] do[es] so, the burden shifts to [the employer] to produce a valid and nondiscriminatory reason for the dismissal. In the final stage, the burden shifts back to the plaintiff[ ] to show that [the employer's] stated reason for [plaintiff's] dismissal was false and but a pretext for discrimination.

*Mulero–Rodriguez*, 98 F.3d at 673 (citations omitted).

We focus particularly on the final stage of the *McDonnell Douglas/Burdine* framework, because we agree with the district court's careful analysis of the first two stages. *See Thomas*, 18 F.Supp.2d at 135. Thomas has established a prima facie case of discrimination by showing that she is a member of a protected class who met Kodak's legitimate performance expectations and was laid off, while Kodak retained persons outside the protected class. *See id.* This created a presumption that Kodak unlawfully discriminated against her. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089). To counter this presumption, Kodak must "articulate some legitimate, nondiscriminatory reason" for its action, *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817, that is, allege "reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action," *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742 (citing *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089). At this second stage, the framework imposes on the defendant only a burden of production. The burden of persuasion remains at all times with the plaintiff. *See id.* at 508, 113 S.Ct. 2742 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). Kodak met its burden of production—and eliminated the presumption that it had discriminated—by contending that its layoff decision was based solely on racially neutral performance appraisal scores. *See Thomas*, 18 F.Supp.2d at 135.

At the third stage of the *McDonnell Douglas/Burdine* framework, the ultimate burden is on the plaintiff to persuade the trier of fact that she has been treated differently because of her race. *See Hidalgo*, 120 F.3d at 335. This burden is often broken into two separate tasks. The plaintiff must present sufficient evidence to show both that "the employer's articulated reason for laying off the plaintiff is a pretext" and that "the true reason is discriminatory." *Udo v. Tomes*, 54 F.3d 9, 13 (1st Cir.1995) (citing *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir. 1994)). For expository convenience, this court has sometimes labeled these two findings "pretext" and "plus" and has referred to the First Circuit rule as a "pretext-plus" standard. *See, e.g., Mullin v. Raytheon Co.*, 164 F.3d 696, 699 (1st Cir. 1999) (describing the difference between the "federal 'pretext-plus' standard and the Massachusetts 'pretext-only' standard"); *Dichner v. Liberty Travel*, 141

F.3d 24, 30 (1st Cir.1998) (describing the " 'pretext plus' approach").

Applying this standard, the district court found that Thomas had met the first part of her burden. It determined that a jury could find that the appraisal scores were objectively unfair or in some sense skewed against Thomas. Accordingly, the court found that "[b]ased only on the evidence presented so far, a reasonable fact finder could determine that Flannery's reasons for lowering plaintiff's [performance appraisal] ratings were pretextual." *Thomas,* 18 F.Supp.2d at 137. As explained below, we agree.

But the court also found that Thomas did not meet the second, "plus" part of her burden: she failed to present evidence to create a genuine issue of fact about whether the allegedly unfair scores were due to her race and not some other factor. *See id.* at 137–38. The court compared the evidence presented by Thomas, which in the court's view amounted only to evidence of "an unwelcoming office environment," "conspicuously unfair treatment" by Flannery, and "a personality conflict between Flannery and plaintiff," *id.,* with the evidence presented by plaintiffs in other First Circuit cases in which plaintiffs had survived summary judgment:

> In all of these cases, the plaintiff alleged at least one piece of evidence that explicitly referred to plaintiff's membership in a protected class, and stated or implied that this membership was or would soon adversely affect plaintiff's employment prospects. By contrast, in cases where plaintiff fails to make any connection between adverse employment actions and membership in a protected class, summary judgment is granted to the employer, and judgment is affirmed.

*Id.* at 138. The court granted summary judgment to Kodak because it found that Thomas had failed to "make any connection" between Flannery's actions and her own membership in a protected class. *Id.* In particular, the court found that Thomas failed to present any evidence that Flan-

nery had *expressly* linked the low scores to Thomas's race and that Thomas's evidence of pretext was not *"flagrant"* enough to support a finding of discrimination on its own. *Id.* (emphasis added).

The district court's analysis mischaracterizes the plaintiff's burden at the third stage of the *McDonnell Douglas /Burdine* framework. To clarify the actual nature of that burden, we make a number of points.

■ First, the labels "pretext" and "plus" must be used with great care. Although it uses the label "plus," the First Circuit's "pretext-plus" standard "does not necessarily require the introduction of additional evidence" beyond that required to show "pretext," i.e., evidence showing that the employer's articulated reason is false. *Dichner,* 141 F.3d at 30. Plaintiffs may use the same evidence to support both conclusions, "provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 22 n. 5 (1st Cir.1999); *see also Udo,* 54 F.3d at 13.

■ A corollary is that there can be no mechanical formula at the third stage of the *McDonnell Douglas /Burdine* framework. "The strength of the prima facie case and the significance of the disbelieved pretext will vary from case to case depending on the circumstances. In short, everything depends on the individual facts." *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 260 n. 3 (1st Cir.1994). Other circuits have highlighted the same point: "The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case." *Fisher v. Vassar College,* 114 F.3d 1332, 1338 (2d Cir.1997). Moreover, "it is difficult, if not impossible, to say in any concise or generic way under what precise circumstances ... an inference [of discrimination from a showing of pretext] will be inappropriate." *Aka v. Washington Hosp. Ctr.,* 156 F.3d

1284, 1294 (D.C.Cir.1998). Because discrimination, and discrimination cases, come in many different forms, a case-by-case analysis is always necessary. There can be no rigid requirement that plaintiffs introduce a separate "plus" factor, such as a negative employer comment about the plaintiff's protected class, in order to prove discrimination. Otherwise, the *McDonnell Douglas/Burdine* framework would no longer serve the purpose for which it was designed: allowing plaintiffs to prove discrimination by circumstantial evidence.[12] *See Smith v. F.W. Morse & Co.*, 76 F.3d 413, 420–21 (1st Cir.1996).

Our second point is related. That "everything depends on the individual facts" means we need to look carefully at the particular type of claim that Thomas is bringing. As we understand Thomas's argument, she alleges a more subtle type of disparate treatment than the type often used to exemplify the operation of the *McDonnell Douglas/Burdine* framework. She does not argue that Kodak has articulated a false reason for her layoff (for example, excessive tardiness) in order to disguise the actual, unrelated reason (her race)—what one might describe as a "truth versus lies" claim—rather, she challenges the racial neutrality of the proffered reason itself. The latter type of challenge is also cognizable as a form of disparate treatment: if an employer evaluates employees of one race less favorably than employees of another race who have performed equivalently, and if race, rather than some other factor, is the basis for the difference in evaluations, then the disfavored employees have been subjected to "discriminat[ion] ... because of ... race." § 2000e–2(a)(1).

The "pretext-plus" label may seem inapposite for this type of claim, since the word "pretext" could suggest a conscious lie. But issues of pretext should not be confused with the issue of whether there has been discrimination "because of race." As the Supreme Court has used the term "pretext," the term provides "no justification for assuming ... that those employers whose evidence is disbelieved are perjurers and liars." *Hicks*, 509 U.S. at 520, 113 S.Ct. 2742. According to the *Hicks* Court, "[t]o say that the company which in good faith introduces such testimony, or even the testifying employee himself, becomes a liar and a perjurer when the testimony is not believed, is nothing short of absurd." *Id.* at 520–21, 113 S.Ct. 2742. The ultimate question is whether the employee has been treated disparately "because of race." This is so regardless of whether the employer consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias. *See Robinson v. Polaroid Corp.*, 732 F.2d 1010, 1015 (1st Cir.1984) (noting that plaintiffs in a disparate treatment case can challenge "subjective evaluations which could easily mask covert or unconscious race discrimination on the part of predominantly white managers"); *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169, 179 (1st Cir.) (permitting a challenge to a decision process in which "bias may often be unconscious and unexpressed"), *vacated on other grounds*, 439 U.S. 24, 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), *aff'd after remand*, 604 F.2d 106, 114 (1st Cir.1979) (noting again that sex discrimination includes "the practice, whether conscious or unconscious, of subjecting women to higher standards of evaluation than are applied to their male counterparts").[13]

---

12. This method of proving a Title VII claim is all the more important now than it was when *McDonnell Douglas* was written, since "smoking gun" evidence is "rarely found in today's sophisticated employment world." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 171 n. 8 (1st Cir.1998).

13. The language in certain other First Circuit cases might suggest that an express and conscious employer intent to discriminate is critical to the third stage of the *McDonnell Douglas/Burdine* inquiry. Cases have stated, for example, that a plaintiff must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham,

The Supreme Court has long recognized that unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus. Indeed, discussing age discrimination in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the Court characterized employer decisions "'based in large part on stereotypes unsupported by objective fact,'" *id.* at 610–11, 113 S.Ct. 1701 (quoting *EEOC v. Wyoming*, 460 U.S. 226, 231, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983)), as "the *essence* of what Congress sought to prohibit in the ADEA," *id.* at 610, 113 S.Ct. 1701 (emphasis added). And the prohibition against this form of disparate treatment is not limited to the context of age discrimination. The Court has interpreted Title VII as "'prohibit[ing] all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin,'" *County of Washington v. Gunther*, 452 U.S. 161, 180, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)), and has noted that this includes "the entire spectrum of disparate treatment of men and women resulting from sex stereotypes," *id.* (quoting *Los Angeles ·Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). Stereotypes or cognitive biases based on race are as incompatible with Title VII's mandate as stereotypes based on age or sex; here too, "the entire spectrum of disparate treatment" is prohibited.

The role of such stereotyping has been discussed most thoroughly in that branch of disparate treatment law developed apart from the *McDonnell Douglas/Burdine*

framework and known as the *Price Waterhouse* framework. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 239–58, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Smith*, 76 F.3d at 420–22 (comparing the two frameworks). The district court in *Price Waterhouse* found that the employer, an accounting firm, had discriminated against Ann Hopkins by permitting stereotypical attitudes about women to play a role in its decision not to invite her to become partner. *See Hopkins v. Price Waterhouse*, 618 F.Supp. 1109, 1118–19 (D.D.C.1985). On appeal, the employer contended that it could not be liable for disparate treatment because "Hopkins did not prove 'intentional' discrimination on the part of the [decision-making] Board, but only 'unconscious' sexual stereotyping by unidentified partners who participated in the selection process." *Hopkins v. Price Waterhouse*, 825 F.2d 458, 468 (D.C.Cir.1987), *aff'g in part and rev'g in part Hopkins*, 618 F.Supp. at 1113–21. The D.C. Circuit squarely rejected this argument:

> In keeping with [Title VII's remedial] purpose, the Supreme Court has never applied the concept of intent so as to excuse an artificial, gender-based employment barrier simply because the employer involved did not harbor the requisite degree of ill-will towards the person in question. As the evidentiary framework established in *McDonnell Douglas* makes clear, the requirement[ ] of discriminatory motive in disparate treatment cases does not function as a "state of mind" element, but as a method of ensuring that only those arbitrary or artificial employment barriers that are related to an employee or applicant's

but a sham intended to cover up the employer's real motive," *Hidalgo*, 120 F.3d at 335 (internal quotation marks omitted), or that in evaluating the evidence for pretext, "we remember that the issue is not whether [the employer's] reasons to fire [plaintiff] were real, but merely whether the decisionmakers … believed them to be real," *Mulero–Rodriguez*, 98 F.3d at 674. But these cases turn

on the particular theories advanced by the plaintiffs therein. *See, e.g., Hidalgo*, 120 F.3d at 335 (considering whether a division was shut down for lack of profits or to eliminate an older employee); *Mulero–Rodriguez*, 98 F.3d at 674–75 (examining whether an employer fired plaintiff because of his alleged failure to maintain inventory levels or because of his age and national origin).

race, sex, religion, or national origin are eliminated.

*Id.* at 468–69 (footnotes omitted); *see also Lynn v. Regents of the Univ. of Cal.*, 656 F.2d 1337, 1343 n. 5 (9th Cir.1981) ("[W]hen plaintiffs establish that decisions regarding . . . employment are motivated by discriminatory attitudes relating to race or sex, or are rooted in concepts which reflect such attitudes, however subtly, courts are obligated to afford the relief provided by Title VII.").

The court of appeals found it unsurprising that the disparate treatment doctrine focuses on causality rather than conscious motivations, since "unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination." *Hopkins*, 825 F.2d at 469. If the plaintiff has shown that she was treated less favorably because of her gender, the court said, "the fact that some or all of the partners at Price Waterhouse may have been unaware of that motivation, even within themselves, neither alters the fact of its existence nor excuses it." *Id.*

The Supreme Court upheld this portion of the D.C. Circuit's decision. *See Price Waterhouse*, 490 U.S. at 250–52, 109 S.Ct. 1775 (plurality opinion); *id.* at 259, 109 S.Ct. 1775 (White, J., concurring in the judgment); *id.* at 261, 272, 277–78, 109 S.Ct. 1775 (O'Connor, J., concurring in the judgment); *see also Hopkins v. Price Waterhouse*, 920 F.2d 967, 969 (D.C.Cir.1990) (affirming district court decision after remand from Supreme Court) (noting that this portion of *Hopkins*, 825 F.2d at 468–69, was upheld by the Supreme Court). The *Price Waterhouse* plurality explained: "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse*, 490 U.S. at 249, 109 S.Ct. 1775. The plurality added that "[b]y focusing on [the plaintiff's] specific proof, . . . we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision." *Id.* at 251–52, 109 S.Ct. 1775.[14]

---

**14.** *Price Waterhouse* also held that an employer could avoid liability for disparate treatment if it could demonstrate that it would have taken the same action in the absence of the discriminatory motive. *See Price Waterhouse*, 490 U.S. at 237–52, 109 S.Ct. 1775 (plurality opinion). This holding was statutorily overruled by the 1991 Civil Rights Act. *See* Civil Rights Act of 1991 § 107, 42 U.S.C. § 2000e–2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). The 1991 Civil Rights Act did not overrule *Price Waterhouse*'s application of Title VII to employer decisions based on stereotypical thinking.

In defining those violations of Title VII for which compensatory damages may be awarded, the 1991 Act uses the phrase "unlawful intentional discrimination." 42 U.S.C. § 1981a(a)(1). This phrase merely distinguishes the disparate treatment framework, and other frameworks in which plaintiffs are individually affected, from the disparate impact framework. *See id.* (limiting compensatory damages to actions in which respondents

"engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact)"). Cases decided after the enactment of the 1991 Civil Rights Act continue to recognize the validity of claims based on employers' biased or stereotypical thinking. *See, e.g., Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (upholding judgment for employer as a matter of law, given insufficient evidence of discrimination, but noting, in case where plaintiff sought compensatory damages, that "[e]vidence of sexual stereotyping may provide proof that an employment decision . . . was based on gender"); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931–32 (7th Cir.1993) (considering whether plaintiff has produced evidence adequate to show that the employer's subjective determinations "reflect[ed] unconscious racial bias"); *Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 864 (D.Minn.1993) (noting that under *Price Waterhouse* expert testimony regarding sexual stereotyping can be relevant to plaintiff's disparate treatment claim). While the Supreme Court recently considered the mental state necessary for the award of punitive damages under the 1991 Civil Rights Act, *see Kolstad v. American Dental Ass'n*, ——

The concept of "stereotyping" includes not only simple beliefs such as "women are not aggressive" but also a host of more subtle cognitive phenomena which can skew perceptions and judgments. *Price Waterhouse* highlighted one such phenomenon: the tendency of "unique" employees (that is, single employees belonging to a protected class, such as a single female or a single minority in the pool of employees) to be evaluated more harshly in a subjective evaluation process. *See id.* at 235–36, 109 S.Ct. 1775; *see also Villanueva v. Wellesley College*, 930 F.2d 124, 131 (1st Cir.1991) (discussing possible relevance of plaintiff's status as the sole employee within a protected class). Other types of biased thinking are also widely recognized. *See generally* L.H. Krieger, *The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity*, 47 Stan. L.Rev. 1161, 1186–1217 (1995) (describing varieties of cognitive bias); C.R. Lawrence III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 Stan. L.Rev. 317, 328–44 (1987) (discussing forms of racism); *see also* D. Charny & G.M. Gulati, *Efficiency–Wages, Tournaments, and Discrimination: A Theory of Employment Discrimination for "High–Level" Jobs*, 33 Harv. C.R.-C.L. L.Rev. 57, 77–78, 83 (1998) (noting the inability of the market alone to correct the effects of cognitive biases and stereotypes).

 We make one final general point about the third stage of the *McDonnell Douglas/Burdine* framework: in the context of a motion for summary judgment, courts must be very cautious about sua sponte finding non-discriminatory reasons for apparently disparate treatment. Although the presumption of discrimination has dropped out of the case by the third stage of the *McDonnell Douglas /Burdine* framework, its rationale remains

relevant: discrimination, rarely explicit and thus rarely the subject of direct evidence, may be proven through the elimination of other plausible non-discriminatory reasons until the most plausible reason remaining is discrimination. *See Burdine*, 450 U.S. at 254 n. 8, 101 S.Ct. 1089 (noting that "the allocation of burdens" in a Title VII case "is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination"). In this case, for instance, the plaintiff has argued that her appraisal scores were unfairly low because of her race, while the defendant has argued that the scores were objectively fair. By finding that plaintiff has presented enough evidence to suggest that her scores were unfairly low, and then speculating that a personality conflict could be the source of that unfairness, the district court erroneously adopted a third view. *See Thomas*, 18 F.Supp.2d at 137–38. No party in this case has argued that a personality conflict explained any disparity in the scores assigned by Flannery, and the district court should not, at summary judgment, have replaced Kodak's articulated explanation sua sponte with its own. It may be that a jury (or judge, if no jury trial is claimed) would find at trial that a personality conflict rather than racial bias is the best explanation for any difference in scores. But the question at summary judgment is not which of the possible explanations is most convincing; it is whether the plaintiff has produced enough evidence to raise a genuine issue of fact regarding *her* explanation.

 Having clarified the actual nature of the plaintiff's burden under *McDonnell Douglas /Burdine*, we now consider whether Thomas has met that burden. Because the employer here has articulated a non-discriminatory reason for its action, the initial presumption of discrimination creat-

U.S. ——, 119 S.Ct. 2118, 2123–26, —— L.Ed.2d —— (1999) (interpreting 42 U.S.C. § 1981a(b)(1), which permits punitive damages where an employer has acted "with malice or with reckless indifference to [the employee's] federally protected rights"), it has not reconsidered *Price Waterhouse* 's conclusion that the phrase "because of" in § 2000e–2(a)(1) is not limited to expressly conscious intent.

ed under *McDonnell Douglas/Burdine* has dropped from the case. *See Hicks,* 509 U.S. at 510–11, 113 S.Ct. 2742; *Smith,* 76 F.3d at 421. This leaves the plaintiff with the ultimate burden of proving discrimination. She must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was race discrimination. *See Udo,* 54 F.3d at 13. In other words, she must produce evidence to permit a reasonable jury to conclude both that disparate treatment occurred and that the difference in treatment was because of race. The same evidence may support both showings. *See id.*

■ The first portion of Thomas's third-stage burden is to produce sufficient evidence to show that she was not evaluated on the same terms as her colleagues, but rather was evaluated more harshly than the other, non-minority CSRs. The district court found that the plaintiff met this portion of her burden: she produced enough evidence to allow a reasonable factfinder to determine that Flannery's reasons for assigning her scores were "pretextual." *Thomas,* 18 F.Supp.2d at 137. We agree.

■ One strong piece of evidence is the sharp drop in Thomas's overall score (from 6 in 1989 to 3 in 1990) after Flannery became her supervisor. While the drop in score would not demonstrate uneven treatment if Flannery were simply a "tough grader," this does not appear to have been the case. In 1990, when Thomas received a 3, all of the other CSRs whom Flannery graded received either a 5 or a 6.[15] Furthermore, over her three years as supervisor Flannery gave CSRs other than Thomas a number of 7s in individual categories, a score that earlier supervisors characterized as extremely rare or even unheard of.

The drop in Thomas's score from 1989 to 1990 would also fail to demonstrate uneven treatment if it merely reflected a higher standard imposed upon Thomas due to her grade change in 1989. According to Kodak, "the higher the wage grade and salary, the more Kodak expected from the employee." Appellee's Brief at 34. But Thomas presents deposition testimony from other supervisors suggesting that there was no such rule, and the scores that Flannery assigned to other Wellesley CSRs seem to bear this out: one CSR who received a grade change in 1991 received a 5 in 1992 after receiving a 6 in 1991 (a drop of only one point rather than three after the grade change), and another CSR who received a grade change in 1991 received a *higher* score the following year (from a 4 in 1991 to a 5 in 1992).

Thomas makes other specific comparisons as well. The strongest of these concern her scores for "quantity of results," which was the most objective of the categories appraised, since it was based directly on the number of machines and installations for which a CSR was responsible. Thomas's scores appear low when compared to the scores for quantity given to other CSRs. In 1990, for instance, Thomas received only a 3 for quantity of results—a below average score—for managing 730 machines and 110 installations, while another CSR, also in the K6 grade, received

---

**15.** This information comes from a summary chart of performance appraisal scores produced by Kodak. For 1990 Kodak apparently retained only Thomas's appraisal form and the overall scores of the other CSRs; it was unable to produce the other five appraisal forms for 1990. Thomas suggests in a footnote that the summary chart "would be inadmissible pursuant to FRE 1006 since the documents summarized are not so voluminous that a jury could not reasonably review them at trial and because the documents summarized were not produced." Appellant's Brief at 18 n. 3. We do not address this argument, since issues not squarely raised by the parties are considered waived. *See Service Employees Int'l Union v. Local 1199 N.E.,* 70 F.3d 647, 654 n. 7 (1st Cir.1995) (noting that a "cursory footnote" does not suffice to raise an issue (internal quotation marks omitted)). In any event, both Kodak and Thomas rely on the information contained in the chart.

a 5 for quantity in 1991 for managing far fewer machines (504) and fewer installations (81). Kodak argues that the comparison is "unfair and analytically unsound" because the other employee had been at the K6 grade for many years, and "[s]ustained performance at a higher grade counts for more than a relatively shorter period of performance at the higher grade." Appellee's Brief at 35. This argument might persuade a jury to discount the value of this comparison, but it does not render the comparison meaningless at summary judgment, where Thomas need only produce evidence sufficient to support her contention that her scores were lower than those given to similarly performing non-minority CSRs. *See Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir.1997) (noting that " '[e]xact correlation is neither likely nor necessary' " and stating that " '[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent.' " (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989))).

In addition to the performance appraisals themselves, Thomas presents other evidence to show that Flannery treated her differently than she treated the other CSRs. According to Thomas, Flannery used flimsy grounds to prevent her from delivering an important presentation at a Kodak meeting, refused to provide her with computer training, failed to allow her appropriate developmental opportunities, and failed to evaluate her accurately on the basis of her interaction with customers (since she never accompanied Thomas on site in order to observe that interaction, as she did with the other CSRs).

On the whole Thomas has presented enough evidence to survive summary judgment on the question of disparate treatment. Some of Thomas's scores, and particularly the 1990 scores, appear lower than one would expect given her apparent performance level. A reasonable jury, examining the evidence Thomas has submitted, could conclude that Thomas was evaluated more harshly than other, non-minority CSRs supervised by Flannery.

Kodak argues that, even if true, this would not matter, because Thomas would have been laid off anyway. Even if Thomas had received the highest possible score (7) in 1990, Kodak says, her PAR ranking would not have changed: because the PAR formula so heavily weighted the two more recent scores, Thomas would still have had the second lowest PAR score among the CSRs and would still have been selected for layoff. There are two flaws with this argument. First, it ignores the natural implications of a finding that the 1990 scores were unfairly low. To the extent that Thomas's 1990 scores were inappropriately low, a factfinder could infer that her later scores—although higher than her 1990 scores—were inappropriately low as well [16] (and indeed, they were consistently lower than the scores given to the other CSRs, as demonstrated by the performance appraisals that Kodak has produced for 1991 and 1992). Second, Kodak's argument ignores the fact that performance appraisal scores were expressly on a curve. According to Kodak's compensation plan, scores were to be "validated" by reference to an informal supervisor ranking of employees in the group. Thus, if Thomas's scores had gone up, other CSRs' scores might have gone down. Whether accurate scoring of Thomas in relation to the other CSRs would have saved her from layoff is something Thomas must prove at trial. But she has created a genuine issue with respect to this question. Not only has she produced evidence which suggests that Flannery treated her differently and graded her more harshly than the other CSRs, she has also produced evidence to support the claim that her earlier evaluations were a more accurate

16. In addition to drawing such an inference, a factfinder might also reach this conclusion—that Thomas's 1991 and 1992 scores were inappropriately low—by relying on the type of direct evidence discussed above with reference to Thomas's 1990 scores.

appraisal of her performance: (1) her promotion in 1989 to the K6 grade, which was reserved for "outstanding" CSRs "servicing the largest and/or most sensitive accounts," (2) her salary, which was higher than her seniority would predict, presumably reflecting the fact that Kodak had, over the years, found her performance level to be comparatively high, and (3) the positive comments from customers and from other supervisors, which suggest that she was in fact one of the better CSRs.

██ Our inquiry does not end with this finding, since even the most blatant unfairness cannot, on its own, support a Title VII claim. "Title VII does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless facts and circumstances indicate that discriminatory animus was the reason for the decision." *Smith*, 40 F.3d at 16; *see also Rodriguez–Cuervos*, 181 F.3d at 21–23. Instead, our focus shifts to the question whether Thomas has produced sufficient evidence to support a finding that the apparent disparity in treatment was due to her race.

As we emphasized above, Thomas can meet her burden with respect to this question using the same evidence used to show unequal treatment. The district court's opinion can be read to say that at this stage the plaintiff must produce what has been called "direct" evidence, such as racially explicit statements. That is not so. There is no requirement that a plaintiff, having shown differential treatment and pretext, must present direct, "smoking gun" evidence of racially biased decision-making in order to prevail. Where the disparity in treatment is striking enough, a jury may infer that race was the cause, especially if no explanation is offered other than the reason rejected as pretextual. That is the case here, since Kodak argues that Thomas's scores were objectively fair, not that they were unfair due to a personality conflict, as the district court surmised.

In fact, Thomas does present additional evidence on this point. She describes incidents and situations which suggest that Flannery had a general disregard for her professional abilities and status. It also appears, from the picture that Thomas paints (and which Kodak does not dispute) that Flannery was at times inappropriately upset or angry with Thomas, to the point of behaving unprofessionally. This, in turn, suggests that she did not respond neutrally to Thomas. A jury might reasonably infer from Thomas's description of these incidents that Thomas's race was an issue for Flannery and that Flannery's evaluations of Thomas were affected by some form of conscious animus or less conscious bias.[17]

Our assessment of the evidence would be quite different if Thomas had been one of several black employees supervised by Flannery, some of whose scores were not low relative to those of the non-minority CSRs. But that was not the case. Thomas was the only black CSR, and one can infer from the evidence that she was also the only CSR who was evaluated unfairly.

17. Thomas describes a number of other incidents from her time at Kodak, not involving Flannery, which she believes to have been racially tinged. (These incidents are recounted in note 4 above.) If true, these incidents are unfortunate, but they are not relevant to the issue whether Flannery evaluated Thomas differently because of her race. As a general matter, "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir.1990). Although "circumstantial evidence of a general discriminatory environment may add 'color' to an employer's decisionmaking process, we have explained that '[p]roof of a general atmosphere of discrimination is not the equivalent of proof of discrimination against an individual.'" *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 249 (1st Cir.1997) (quoting *Sweeney*, 604 F.2d at 113). Because the incidents that Thomas describes appear to have been isolated in time and limited in number, and because these incidents did not appear to involve individuals in a position of influence over Flannery, we do not take them into account.

Given this, it is reasonable to infer that race played a determinative role in the evaluation process—especially since there is also other evidence that Flannery treated Thomas poorly. Indeed, the very fact that Thomas was the only black CSR at the Wellesley office may have increased the likelihood that she would be evaluated more harshly. *See Price Waterhouse,* 490 U.S. at 235–36, 109 S.Ct. 1775; *Villanueva,* 930 F.2d at 131.

In the end, Thomas is in a different position than a plaintiff who merely "disagree[s] with [the employer's] assessment of her relative performance." *Compton v. GTE Gov't Sys., Corp.,* No. 93–11383, 1995 WL 791938, at *6 (D.Mass. Dec. 7, 1995), *cited in Thomas,* 18 F.Supp.2d at 136; *see also Blick v. Pitney Bowes Management Servs., Inc.,* No. 93–11573, 1995 WL 791945, at *5 (D.Mass. Dec. 26, 1995) (noting that a plaintiff's mere disagreement with the employer's "assessment of his work attitude . . . is not sufficient to create a triable federal discrimination claim"), *cited in Thomas,* 18 F.Supp.2d at 136. Thomas has presented "evidence from which the trier of fact reasonably could conclude that [her] abilities and qualifications were equal or superior to employees who were retained." *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1119 (1st Cir.1993). It is not an "improbable inference[ ]" or "unsupported speculation," *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990), to further conclude, based on the evidence available at summary judgment, that Kodak failed to recognize this fact because it relied on an evaluation procedure that was tainted by racial bias.

### IV

Thomas's claim is timely, and it is based on sufficient evidence to permit a reasonable jury to find that Flannery discriminated against Thomas because of her race when she assigned the performance appraisal scores that led to Thomas's layoff. Accordingly, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

Costs are awarded to appellant.